# In the United States Court of Federal Claims

No. 19-1408
(Filed:  10 February 2025)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| SARAH E. PRICE, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Steven M. Wald*, with whom were *Michael J. Smith*, of St. Louis, MO, and *Thomas S. Stewart* and *Reed W. Ripley*, of Kansas City, MO, all of Stewart, Wald & Smith, LLC, for plaintiff.

*Laura W. Duncan*, Trial Attorney, with whom were *Dustin J. Weisman* and *Sarah R. Ruckriegle*, Environment and Natural Resources Division, Department of Justice, all of Galveston, TX, for defendant.

## **TRIAL ORDER**

**HOLTE, Judge.**

The Fifth Amendment's *mandate* on the government to pay just compensation for takings of private property is nothing new.  As noted by former California Supreme Court Justice, later D.C. Circuit Judge, Janice Rodgers Brown in her dissent from the majority's opinion in *San Remo Hotel L.P. v. City and County of San Francisco*, 41 P.3d 87 (Cal. 2002), *cited generally*, 545 U.S. 323 (2005), "[t]he essence of private property is the right to use that property as one sees fit and for one's own advantage.  The police power . . . does not permit the government to achieve its social agenda by ordering a political minority to dedicate its property to the benefit of a group the government wishes to favor. . . .  [S]uch a regulation amounts, in practical effect, to a transfer of title and requires the government to pay its way."  *Id.* at 121; *see Sheetz v. County of El Dorado*, 601 U.S. 267 (2024) (reasoning favorably cited within).  What *is* new in this case is the government's entreaty to the Court to redefine what qualifies as "compensation."

At issue is plaintiff's residential land bordering an abandoned railroad in the Piedmont Heights neighborhood of Atlanta, Georgia.  In September 2017, through the National Trails System Act, the federal government appropriated more than half of plaintiff's residential

property for conversion into a stretch of the Atlanta Eastside BeltLine, a popular multi-use trail which snakes through the city's various neighborhoods. On 15 October 2021, the Court granted plaintiff's Motion for Partial Summary Judgment and held the conversion of the railroad adjoining plaintiff's property pursuant to the Trails Act was a taking under the Fifth Amendment. As the Fifth Amendment prevents the government from taking private property for public use without the payment of just compensation, the only question now is the value of land taken.

Plaintiff argues she is entitled to more than one million dollars in compensation to restore her pecuniary position prior to the taking of her land. The government, however, raises a novel argument against compensating plaintiff, alleging "credible evidence" demonstrates the BeltLine created a market value increase in plaintiff's property exceeding "any diminution in value caused by her loss of property rights," thus she "is not entitled to compensation from the taxpayers." Gov't's Pre-Trial Br. at 2–3 (emphasis added), ECF No. 97. Citing the doctrine of special benefits, the government alleges any benefit derived from a government project should offset the damages owed to landowners whose property is condemned for the project—even if the benefit is far greater for the community than for those individuals suffering the taking. *See infra* Sections III, VIII.A. While such a compensation theory has not previously been advanced—the government does not lack for innovation—the taking here does not create a new consideration for how courts should consider the Fifth Amendment. As then-Justice Brown noted in *San Remo*, "[i]f the relevant case law is sparse, it is only because no public agency [or the Department of Justice] has ever been so bold." 41 P.3d at 126. Indeed, when asked whether a landowner whose front yard is appropriated for the construction of a new subway station is entitled to compensation when the station *doubled* the value of nearby properties—but only increased the landowner's property value by 50%—the government argued the landowner is entitled to *no compensation*. *See infra* Section VIII.A. This cannot be the case.

The government's interpretation of the doctrine of special benefits is in fact contrary to caselaw and runs afoul of the Takings Clause. *See infra* Section VIII. As explained by the Supreme Court and the Federal Circuit, the doctrine of special benefits permits the offset of compensation for a partial taking only when identifiable benefits "associated with the ownership of the remaining land" adjacent to the government project "inure specifically to the landowner who suffered the partial taking"—*i.e.*, they are "special" to the injured landowner. *See Hendler v. United States*, 175 F.3d 1374, 1380 (Fed. Cir. 1999). Similar to *Brown v. Legal Foundation of Washington*—where the Supreme Court addressed the government's seizure of "private property, without paying compensation, on the ground that the former owners suffered no 'net loss' because their confiscated property was created by the beneficence of a state regulatory program"—permitting the government to avoid compensation here would allow a "Robinhood Taking" where "the normal rules of the Constitution protecting private property are suspended." 538 U.S. 216, 252 (2003) (Scalia, J., dissenting). As then-Justice Brown admonished, such a hollow interpretation of the constitutional right "does not enhance the stature of the [government]; it only diminishes [its] legitimacy." *San Remo*, 41 P.3d at 128.

For the reasons noted above and further explained in this Trial Order and based on the evidence presented by the parties at trial, the Court awards plaintiff compensation in the amount of $684,429, exclusive of interest.  *See infra* Section IX.

## I.    Legal and Factual Background Related to the Subject Property

The Court begins by detailing the applicable law concerning the National Trails System Act and Rails-to-Trails Takings cases.  The Court then summarizes the undisputed factual backgrounds pertinent to the case.  Finally, the Court details the procedural history of the case.

### A.    The National Trails System Act and Rails-to-Trails Takings Cases

Section 8(d) of the National Trails System Act authorizes "[t]he Secretary of Transportation, the Chairman of the Surface Transportation Board [("STB")], and the Secretary of Interior . . . [to] encourage [s]tate and local agencies and private interests to establish appropriate trails . . . to preserve established railroad rights-of-way for future reactivation of rail service."  *See* 16 U.S.C. § 1247(d).  This provision permits "a railroad wishing to cease operations along a particular route . . . [to] negotiate with a [s]tate, municipality, or private group that is prepared to assume financial and managerial responsibility for the right-of-way."  *Preseault v. I.C.C.*, 494 U.S. 1, 6–7 (1990).  "If the parties reach agreement, the land may be transferred to the trail operator for interim trail use."  *Id.*  In a process called railbanking, these corridors are then converted into recreational trails, *see Agapion v. United States*, 167 Fed. Cl. 761, 766 (2023), "to preserve [them] . . . for future reactivation of rail service," 16 U.S.C. § 1247(d); *see Preseault*, 494 U.S. at 6.

The mechanics of railbanking are important to the rails-to-trails takings analysis.  *See Agapion*, 167 Fed. Cl. at 766.  To abandon rail lines, railroads must first notify the STB.  *See* 49 U.S.C. § 10903(a); *Preseault*, 494 U.S. at 5 (recognizing the significant amount of railway abandonment and noting "the Nation's railway system reached its peak of 272,000 miles [in 1920]; today only about 141,000 miles are in use, and experts predict that 3,000 miles will be abandoned every year through the end" of the twentieth century); *see also* 49 C.F.R. § 1152.26(a) (providing the schedule "govern[ing] the process for [the STB's] consideration and decisions in abandonment and discontinuance application proceedings").  Upon the notice of intent to abandon, "any state, political subdivision, or qualified private organization [who] is interested in acquiring or using a right-of-way of a rail line proposed to be abandoned for interim trail use and rail banking" may "file a comment or other[]" petition "indicating that it would like to do so."  49 C.F.R. § 1152.29(a).  If the "railroad agrees to negotiate an interim trail use/railbanking agreement," the STB "will issue a Notice of Interim Trail Use or Abandonment (NITU) to the railroad and to the interim trail sponsor for the portion of the right-of-way as to which both parties are willing to negotiate."  49 C.F.R. § 1152.29(d)(1).  The NITU "permit[s] the railroad to discontinue service [on the relevant rail line], cancel any applicable tariffs, and salvage track and materials, consistent with the interim trail use and railbanking . . . ; and permit[s] the railroad to fully abandon the line if no interim trail use agreement is reached within one year from the date on which the NITU is issued. . . ."  49 C.F.R. § 1152.29(d)(2).  If the railroad and trail sponsor "execute a trail use agreement," resulting in the use of the rail corridor for recreational purposes, "then abandonment of the rail line is stayed for the duration of the

agreement." *Technical College of the Low Country v. United States*, 145 Fed. Cl. 408, 413 (2019) (first citing 16 U.S.C. § 1247(d); and then citing 49 C.F.R. § 1152.29(c)–(d)). This railbanking process "creates a new easement that lasts in perpetuity, or until the trail is no longer used for recreation or rail-line reactivation." *Agapion*, 167 Fed. Cl. at 766 (citations omitted). According to the Trails Act, this "interim use shall not be treated, for purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d).

As "many railroads do not own their rights-of-way outright but rather hold them under easements," railbanking pursuant to Section 8(d) often "gives rise to a takings question." *Preseault*, 494 U.S. at 8. In *Preseault*, the Supreme Court held "to the extent that the application of the Trails Act results in a Fifth Amendment taking by preventing a property owner from regaining an unencumbered interest in the land subject to a right-of-way, the Tucker Act authorizes suit in the Court of Federal Claims" for just compensation. *Caquelin v. United States*, 959 F.3d 1360, 1364 (Fed. Cir. 2020) (citing *Preseault*, 494 U.S. at 11–17). In a subsequent decision, the Federal Circuit determined "establishment of a trail under the Trails Act results in a Fifth Amendment taking when the original easement granted to the rail carrier under state property law is not sufficiently broad in scope to encompass recreational trail use." *Id.* (citing *Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) (en banc)).

### B.    Undisputed Factual Background

At issue here is plaintiff's property located at 403 Montgomery Ferry Drive NE, Atlanta, Georgia (the "Subject Property"). Joint Statement of Stipulated Facts ("J. Statement of Stip. Facts") at 2, ECF No. 114-2; *see id.* at 3 ("The Fulton County[, Georgia] parcel number of the portion of the property outside of the rail/trail corridor is 17 0056-0006-0225."); *see also* Plaintiff's Exhibit ("PX") 9. Plaintiff purchased the Subject Property "around April 2010, for $325,000," J. Statement of Stip. Facts at 4, and then took out a "construction loan [of $197,000] that brought [plaintiff's] financial commitment up to $522,000," *see* Trial Transcript ("Tr.") at 17:20–24 (Price).[1] At the time of purchase, the Subject Property was unlivable and needed extensive repairs. *See* Tr. at 18:3–5 ("[PLAINTIFF]: The top two units were uninhabitable due to roof leakage. The bottom unit was gutted, and it clearly needed to be remodeled before it could be occupied."); *see also* PX7 (showing photographs of the property at the time of purchase). The Subject Property now "contains improvements including a tri-plex consisting of three multifamily apartment units." J. Statement of Stip. Facts at 3; *see* PX7 (showing photographs of the property after renovations). The Subject Property "has 145.13 feet of frontage on Montgomery Ferry Drive and . . . 150 feet of depth," J. Statement of Stip. Facts at 3, and is approximately 24,770 square feet. Tr. at 20:22–24 (Plaintiff's Counsel). In addition to the railroad easement at issue in this case, the Subject Property is also served by a driveway easement "used to access the subject property from Montgomery Ferry Road, N.E.," an

---

[1] The trial transcript is divided into four documents, *see* ECF Nos. 128, 130, 132, and 134, with a fifth containing the transcript from closing arguments, *see* ECF No. 144. As the pagination is continuous between these documents, the Court omits the docket number and date of the transcript and cites only to the page and line number. Transcript citations also include the last name of the speaker or a description of the testimony as necessary. Plaintiff proffered the testimony of three expert witnesses, Phillip Cook, David Matthews, and Ted Tatos. The government proffered two expert witnesses, Edmund Eslava and Spencer Banzhaf, and two fact witnesses, Frank Clementi and Erik Pace. Throughout the trial, both parties referred to plaintiff as Sarah Price or Ms. Price.

encumbrance by a "Georgia Power Company . . . transmission powerline easement over a portion of the property," J. Statement of Stip. Facts at 3–4, and a sewer easement on the south-central portion of the Subject Property, *see* Tr. at 325:12–15 (Cook). Plaintiff "lived in the" triplex on the Subject Property "for almost a decade" and "rented out the" other two units "throughout her ownership." Pl.'s Post-Trial Br. at 15, ECF No. 138 (citing Tr. at 44:22–45:11 (Price) (explaining "multiple people . . . rented" the two units not occupied by plaintiff throughout her ownership of the Subject Property)).

On 1 September 2017, Atlanta BeltLine, Inc. ("ABI"), "a Georgia non-profit corporation and implementation agent of the city of Atlanta, filed a request for the issuance of a [NITU] . . . to negotiate with Norfolk Southern Railway Company [("NSR")] for acquisition of approximately 1.0 mile of rail between milepost DF 632.10 and milepost 633.10 in Atlanta, Georgia . . . for use as a trail under the" Trails Act. J. Statement of Stip. Facts at 1–2. Four days later, on 5 September 2017, NSR "notified the STB that it was willing to negotiate with ABI for railbanking and interim trail use." *Id.* at 2. STB later issued a NITU for this corridor on 27 September 2017, *id.*, and on 13 October 2017, "ABI and NSR entered a railbanking and interim trail use agreement," *id.* Following this agreement, ABI "constructed a multi-use trail in the former rail/trail corridor adjacent to the Subject Property," which is now known as the Northeast BeltLine Trail. *Id.* at 3. The Northeast BeltLine Trail is part of the "approximately 22-mile loop of multi-use trails circling Atlanta," known collectively as the BeltLine. *Id.* at 3–4.

The Subject Property is not only "adjacent to the" BeltLine, but contains property "underlying the" BeltLine. J. Statement of Stip. Facts at 3; *see also* Gov't's Pre-Trial Mem. at 4–5 ("This case concerns a property that [p]laintiff previously owned . . . along a 1.0-mile railroad corridor under urban Atlanta, Georgia."); Pl.'s Pre-Trial Mem. at 14–15, ECF No. 74 ("The Railroad Segment stretched across and abutted property owned by [plaintiff]."). "The portion of the Subject Property subject to the Trails Act easement is 100 feet by 150 feet," a total of 15,000 square feet. J. Statement of Stip. Facts at 3. The remainder—the "portion of the Subject Property not subject to the Trails Act easement," *id.*—is "[6]5.13 feet by 150 feet, [for a total of 9,770 square feet] and . . . contains improvements including [the] tri-plex consisting of three multifamily apartment units," *id.*; *see* Tr. at 1155:7–14 (Plaintiff).

## C. Procedural History of this Case

On 12 September 2019, plaintiff Sarah E. Price filed a complaint alleging "[b]y operation of the Trails Act," the government "took [] [p]laintiff's property [for] which it is [c]onstitutionally obligated to pay just compensation" under the Takings Clause of the Fifth Amendment of the United States Constitution. *See* Pl.'s Compl. at 2, ECF No. 1; *see also* U.S. CONST. amend. V. Following an initial status conference, *see* 23 January 2020 Scheduling Order, ECF No. 8, the parties filed cross-motions for summary judgment, *see* 30 June 2020 Scheduling Order, ECF No. 15. Plaintiff's Motion for Partial Summary Judgment alleged NSR "and its predecessors merely held an easement for railroad purposes at the time of abandonment." *See Price v. United States*, 156 Fed. Cl. 281, 285 (2021). In granting plaintiff's summary judgment motion, the Court found "NSR and its predecessors only held an easement at the time of abandonment," meaning the government's "conversion of the abandoned railroad

adjoining [plaintiff's] property [to a recreational trail] pursuant to the National Trails System Act [wa]s a taking under the Fifth Amendment." *Id.*

Following unsuccessful settlement discussions, *see* 15 November 2021 Status Report Order, ECF No. 31, the parties conducted fact and expert discovery, *see* 31 October 2022 Order, ECF No. 45; *see also* 9 December 2022 Order, ECF No. 47; 22 March 2023 Order, ECF No. 51, 8 May 2023 Order, ECF No. 54. Upon the close of discovery, the parties engaged in pre-trial briefing and motions practice. *See* 4 August 2023 Scheduling Order, ECF No. 62 (setting the pre-trial schedule). On 25 April 2024, the Court granted plaintiff's Unopposed Motion for Trial, ECF No. 55, and scheduled trial for the week of 10 June 2024 in Atlanta, Georgia. *See* 25 April 2024 Order, ECF No. 116. The Court then held a four-day valuation trial from 10 June 2024 to 13 June 2024, during which the Court and counsel for both parties visited the Subject Property on the first day of trial, 10 June 2024. *See id.* In a pre-trial order the Court ordered post-trial briefing. *See* 25 April 2024 Order. Plaintiff filed its Post-Trial Brief on 24 July 2024. *See* Pl.'s Post-Trial Br. The same day, the government filed its Post-Trial Brief. *See* Gov't's Post-Trial Br., ECF No. 139. The parties both filed their post-trial responsive briefs on 7 August 2024. *See* Pl.'s Resp., ECF No. 141; Gov't's Resp., ECF No. 142. The Court then held closing arguments on 4 September 2024 in Washington, D.C. *See* 31 July 2024 Scheduling Order, ECF No. 140.

## II.    Plaintiff's Valuation Arguments and Affirmative Trial Testimony

Plaintiff alleges "using a valuation date of September 28, 2017, which is the date of the taking, Ms. Price's [p]roperty lost [o]ne [m]illion [o]ne [h]undred [t]housand [d]ollars ($1,100,000) in market value because of the governmental taking." Pl.'s Pre-Trial Mem. at 2 (emphasis omitted); *see* Plaintiff's Exhibit ("PX") 21 at 59 (Cook Expert Report) (concluding plaintiff is entitled to $1,100,000 in damages). According to plaintiff, as the "BeltLine was constructed over the 15,000 square feet of Ms. Price's [p]roperty located within the former railroad corridor"—leaving plaintiff with only a "9,770 square foot parcel" and a "busy and intrusive recreational trail . . . next to [her] triplex multi-family residential building"—she is entitled to the $1.1 million she "lost in market value because of the governmental taking." Pl.'s Pre-Trial Mem. at 1–2.

### A.    Plaintiff Sarah Price's Trial Testimony

Both parties presented plaintiff's testimony in support of their case. *See* Tr. at 37:13–206:21 (Testimony of Ms. Price). Ms. Price testified as to her 2010 acquisition of the Subject Property, *see* Tr. at 39:20–40:4; her reasons for purchasing it, including "to produce an income stream" from a property "that is walkable and available to retail," "in [an] affluent neighborhood," Tr. at 40:5–21, and "proxim[ate] to the BeltLine," Tr. at 111:4–17; her 2010–11 renovations of the property including "new windows, doors, siding[,] . . . entirely demo[ing] and rebuil[ding] [the deck][,] along with the stairs, interior flooring, lighting, plumbing, kitchen, [and] bath painting," *see, e.g.*, Tr. at 41:5–43:19; her rezoning of the property "into a triplex" as it had been mistakenly zoned by Atlanta as a duplex even though "Fulton County records show[ed] that it was a triplex," Tr. at 43:20–44:15; and her 2021 sale of the property for $2,000,000, *see* Tr. at 146:18–148:20. Ms. Price further testified regarding her approximately nine years living at the Subject Property, *see* Tr. at 44:22–45:11, her use of the property as an

income-generating rental, *see, e.g.*, Tr. at 123:8–129:16 (discussing Defendant's Exhibit ("DX") 24 (Subject Property Rental Advertisement)), and the 2016 appraisals of the Subject Property she received at $780,000 and $850,000, *see* Tr. at 118:1–121:24.  Finally, Ms. Price discussed at length the various easements encumbering the Subject Property.  In particular, Ms. Price explained, due to Georgia Power Company's ("GPC" or "Georgia Power") easement over the Subject Property, GPC "retain[ed] the right to remove . . . obstructions as needed," Tr. at 197:17–198:4, and previously "tor[e] down" an external staircase due to "concern[s] about the arcing of the high-voltage power lines above and the safety of the residen[ts] at the top level," *see* Tr. at 82:5–23 (discussing PX7 (photograph of the staircase later removed by Georgia Power)).  As a result of Georgia Power's right to remove obstructions, Ms. Price explained she was required to submit a "right-of-way encroachment application" when installing "hardscaping and landscaping at the property" in 2016.  *See* Tr. at 199:4–200:25.  Ms. Price also acknowledged, "Georgia Power Company moved [its] easement" on the Subject Property "further west" in 2018.  Tr. at 205:16–21.  Ms. Price further discussed the driveway easement, which—to her knowledge—"guarantee[s] legal access to" the Subject Property through the properties to the east.  Tr. at 49:5–17 (discussing Joint Exhibit ("JX") 3 (Driveway Easement)).  Perhaps most importantly, however, Ms. Price testified to the state of the railroad corridor before the construction of the BeltLine, *see* Tr. at 175:1–19; the "dust[] and dirt[]" and "debris and earth moving" creating "concerns about safety, security," and pollution during the BeltLine's construction, Tr. at 101:7–20; and similar concerns, including the "loss of privacy," resulting from the completed BeltLine and BeltLine on-ramp, *see* Tr. at 101:21–102:7.

### 1.    Plaintiff's Motion in Limine Regarding a Federal Highway Administration Periodical Allegedly Containing an Interview of Ms. Price

On 10 June 2024, during the government's cross-examination of Ms. Price, the government sought to introduce DX200, "the September/October 2011 issue of the periodical called *Public Roads*, published by the Federal Highway[] Administration under the Department of Transportation."  Gov't Public Roads Resp., ECF No. 135.  Plaintiff initially objected arguing:  (1) the government failed to establish a foundation for this document; and (2) this document was hearsay.  *See* Tr. at 130:12 (Plaintiff's Counsel).  During the cross-examination, the government "turn[ed] to DX200-26," a portion of the publication describing an alleged interview of plaintiff regarding the Atlanta BeltLine, *see* Tr. at 132:10–133:9 ("[GOVERNMENT:]  I'd now like to turn to DX200-26. . . .  You'd agree the first sentence states:  'Sarah Price and Tyler Blind have no doubts that the BeltLine is benefitting them economically.  Both purchased their homes because of proximity to the new amenity,' correct?"), and contained alleged quotations from Ms. Price, *see* Tr. at 135:1–145:25 (detailing exchange between counsel and the Court over the admissibility of the document and explaining the alleged quotes by Ms. Price).  Plaintiff again objected, arguing this "statement of a reporter" lacks foundation and is hearsay.  *See id.*  The Court, however, admitted the document as self-authenticating subject to plaintiff's continued hearsay objection related to the alleged interview at DX200-26.  *See* Tr. at 143:1–145:24.  While plaintiff ultimately (1) "withdr[e]w the foundation" objection and conceded a Department of Transportation periodical is self-authenticating pursuant to Rules 902(5) and (6) of the Federal Rules of Evidence ("FRE"); and (2) clarified "[p]laintiff's objection and motion" had "nothing to do with DX200's general

admissibility," Pl.'s Public Roads Reply at 1, ECF No. 136, plaintiff maintained its hearsay objection as to the alleged interview at DX200-26 and filed a motion to support the objection on 11 June 2024, *see* Pl.'s Public Roads Mot., ECF No. 124; Tr. at 142:2–22; *see also* FED. R. EVID. 902(5)–(6) (explaining "official publications" and "newspapers and periodicals" are self-authenticating).  According to plaintiff, because the government "has neither demonstrated that the alleged statements of Ms. Price . . . are accurate nor demonstrated that Ms. Price subsequently and specifically adopted those statements as true," Pl.'s Public Roads Mot. at 2–3, the "alleged statements of Ms. Price . . . constitute hearsay" and should not be admitted, *id.* at 3.  In support of admitting DX200-26, the government argues:  (1) pursuant to FRE 801(d)(2), "[s]tatements of a party-opponent are not hearsay," Gov't's Public Roads Resp. at 5; and (2) to the extent there is a second layer of hearsay as the interview was transcribed by a non-party reporter, "Ms. Price . . . adopted" these statements "during her testimony at trial," meaning they are "not hearsay under [FRE] 801(d)(2)(B)," *id.* at 3–5 (quoting Tr. at 140:7–10).

Pursuant to the Federal Rules of Evidence, a statement is not hearsay when "offered against an opposing party" if such statement was "made by the party" or "is one the party manifested that it adopted or believed to be true."  FED. R. EVID. 801(d)(2)(A)–(B); *see Globe Savings Bank, F.S.B. v. United States*, 61 Fed. Cl. 91, 94–95 (2004) (explaining credible "admission[s] by a party-opponent" are "'not hearsay'").  Further, FRE 805 explains "[h]earsay within hearsay is not excluded by the rule against hearsay if *each part of the combined statements conforms with an exception*."  FED. R. EVID. 805 (emphasis added).  In its written Motion, plaintiff argues Ms. Price's alleged statements are "out-of-court statements offered in evidence to prove the truth of the matter asserted," meaning they are inadmissible hearsay.  Pl.'s Public Roads Mot. at 3.  In response, the government argues these are adopted statements of a party opponent which are admissible pursuant to FRE 801(d)(2).  Gov't's Public Roads Resp. at 5–6.  Specifically, according to the government, plaintiff "'subsequently adopted' the statements and quotations in DX200[-26]," *id.* at 6, during the following exchange at trial:

> [GOVERNMENT:]  And when you received [a copy of] the story from [the reporter], did you believe that it was . . . incorrect?
>
> [PRICE:]  No.  I didn't . . . I don't, today, recall having a conversation with the writer of the story.  I don't remember that.

Tr. at 140:7–10.  Ms. Price's alleged statements at DX200-26 present an issue of "[h]earsay within hearsay," s*ee* FED. R. EVID. 805, as not only are the quotations allegedly those of Ms. Price from an out-of-court interview, but they were recorded by a non-party reporter more than a decade ago.  As to the first layer—Ms. Price's own alleged out-of-court statements—although the interview at DX200-26 allegedly contains quotations provided by Ms. Price, the Court cannot confirm the statements proffered by the government were "made by" Ms. Price as required by FRE 801(d)(2)(A).  *See* FED. R. EVID. 801(d)(2)(A)–(B) (explaining a statement is not hearsay when "offered against an opposing party" if such statement was "made by the party . . . [or] is one the party manifested that it adopted or believed to be true").  When asked at trial whether she "remember[s] talking with somebody that was preparing this story," Ms. Price alleged she does not "recall the conversation."  Tr. at 140:4–6.  Further, assuming *arguendo*, Ms. Price *did* make the statements presented at DX200-26, the government has not proffered an "exception to the

rule" against hearsay sufficient to cure the second hearsay layer—that these statements were recorded and written out of court by a third-party reporter. Although the government alleges Ms. Price "'subsequently adopted' the statements and quotations in DX200[-26]," Gov't's Public Roads Resp. at 6, Ms. Price did not do so at trial. Instead, Ms. Price merely stated she does not "recall having a conversation with the writer of the story." *See* Tr. at 140:7–10; *see* Tr. at 140:1–12; *see also* Pl.'s Public Roads Reply at 2 ("The United States grasps on to Ms. Price's response of 'No' when asked whether the published story was incorrect, but that ignores the context of the answer and Ms. Price's full testimony regarding the *Public Roads* story, which is evidence even from the rest of her answer as cited in the United States' response."). Thus, even if the Court could confirm the statements at issue were made by Ms. Price, the out-of-court statements of the non-party reporter do not "conform[] with an exception to the rule" against hearsay. *See* FED. R. EVID. 805 (explaining "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception"). As such, the statements attributed to Ms. Price at DX200-26 are inadmissible to prove the truth of the matter asserted. *See* FED. R. EVID. 801(c); *see also Manley v. Sec'y of Dep't of Health & Hum. Servs.*, 18 Cl. Ct. 799, 811 (1989). The Court therefore grants plaintiff's Motion, ECF No. 124.

## B.    Testimony of Plaintiff's Expert Appraiser Philip Cook

In support of its theory of damages, plaintiff offered reports and testimony from three experts. *See* Pl.'s Witness & Ex. List, ECF No. 75. First, plaintiff proffered a report, *see* PX21 (Cook Expert Report), and testimony by Mr. Cook, managing director of the Salt Lake City office of BBG, Inc., "a real estate appraisal and consulting firm," *see* PX22 at 1 (Curriculum Vitae of Mr. Cook). "Mr. Cook has 42 years [of] full-time appraising and consulting experience and holds a BS degree in finance with a real estate emphasis and an MBA from the University of Utah." *Id.*; *see also* Tr. at 231:2–238:21 (Qualification of Mr. Cook as an Expert by plaintiff).

At trial, Mr. Cook testified as to the contents of his expert report. *See* Tr. at 229:16–424:22 (Cook's Testimony on his Expert Report); *see also* PX21(Cook Expert Report). Mr. Cook explained, *see infra*, the highest and best use of the Subject Property in the before condition is a multifamily development with "a total of seven units." *See* Tr. at 247:2–249:14. "Having determined [the] highest and best use of the before condition of the" Subject Property, Mr. Cook conducted a "sales comparison approach" focused on "like sales that share [] the [S]ubject [P]roperty's highest and best use." Tr. at 251:5–16; *see* PX21 at 25. According to Mr. Cook, as appraisers must "always value land as though vacant and available for development to its highest and best use," he "selected the multifamily sales that best reflected the subject's highest and best use." Tr. at 251:11–16; *see* Tr. at 251:17–23 ("[COOK:] [For before condition sale comparisons,] I also look[ed] for sales that were as close in proximity as I could, but that were not on the trail or likely were not going to be influenced by a trail."). Mr. Cook testified as to the similarities and differences between the Subject Property and his selected comparison properties, *see* Tr. at 252:9–256:3, as well as the "directional adjustments" he applied to estimate the value of the Subject Property in the before condition, *see* Tr. at 256:5–25; *see also* PX21 at 25. Ultimately, in the before condition, Mr. Cook estimated the value of the Subject Property at "$65 per square foot," which yields "a [before] value of $1,600,000 for the" Subject Property. Tr. at 257:19–22. For Mr. Cook's after-condition valuation, he "would have liked to have found sales on the BeltLine . . . that were otherwise comparable to the [S]ubject [P]roperty," but "could

not," so he used the "same sales" as in his before analysis. Tr. at 259:5–260:3. In the after, Mr. Cook also "used a paired data analysis . . . designed to identify or assist in quantifying an adjustment for trail proximity" by "find[ing] sales on [a] trail and sales off the [same] trail that are otherwise similar . . . isolating only the trail as the remaining variable." Tr. at 260:7–22; *see* Tr. at 260:23–264:9 (detailing Mr. Cook's description of his paired sales analysis). Applying a "20 percent diminution factor against" the remaining "9,770 square feet" due to "damages to the remainder," Mr. Cook valued the price per square foot of the Subject Property at $52 in the after condition, implying an after value of $508,040. *See* Tr. at 264:12–268:14. Thus, "the value of the taking," according to Mr. Cook, is approximately $1.1 million (Subject Property Before Value – Subject Property After Value = Value of the taking). *See* Tr. at 268:22–269:9.

### 1.    The Government's Motion in Limine to Exclude Mr. Cook

On 27 October 2023, the government filed a motion in limine to "exclude the expert testimony and appraisal report . . . [of Mr.] Cook[] because his anticipated trial testimony and appraisal report fail to meet the threshold requirement of reliability under" FRE 702. Gov't's Mot. in Limine to Exclude Cook at 1, ECF No. 69. Specifically, the government alleges "Mr. Cook's anticipated testimony and appraisal report is not reliable because the central component of his market value opinion—a diminution factor derived from case studies—improperly relied on recycled data from case studies hundreds of miles away that have no resemblance to the Atlanta BeltLine." *Id.* The government renewed its objection to the admission of Mr. Cook's testimony at trial. *See* Tr. at 238:22–239:13. In response, plaintiff alleged "Mr. Cook's appraisal conforms with relevant case law and appraisal standards" and should therefore not be excluded. Pl.'s Resp. to Gov't Mot. to Exclude Mr. Cook at 3, ECF No. 85. The Court conditionally admitted Mr. Cook at trial "subject to a later [FRE] 702 determination." Tr. 239:12–13; *see UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 825, 833 (3rd Cir. 2020).

In *Daubert v. Merrell Dow Pharma, Inc.*, the Supreme Court held, under FRE 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). The Court weighed the risk of "*juries* [being] confounded by absurd and irrational pseudoscientific assertions" against the possibility that "a gatekeeping role for the judge . . . on occasion will prevent *the jury* from learning of authentic insights and innovations," *id.* at 596–97 (emphasis added). FRE 702's language allows a "witness who is qualified as an expert . . . [to] testify . . . if the proponent demonstrates to the court that it is more likely than not that: [] the expert's . . . knowledge will help *the trier of fact* . . . ." *See* FED. R. EVID. 702 (emphasis added). This language applies to both jury and bench trials, and as the Supreme Court's jury-related considerations in *Daubert* suggest, the discretion to exclude unreliable expert testimony—*i.e.*, "discretion [] to choose among reasonable means of excluding expertise that is *fausse* and science that is junky," *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 159 (1999) (Scalia, J., concurring)—is greater in bench trials, where the concerns underlying *Daubert* carry "lesser import." *See Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (stating the "concerns [underlying the standard in *Daubert*] are of lesser import in a bench trial"); *see also In re Zurn Pex Plumbing Prods. Liability Lit.*, 644 F.3d 604, 613 (8th Cir. 2011) ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony. That interest is not implicated . . . where the judge is the decision maker."); *Gilead Sciences, Inc. v. United States*, 160 Fed. Cl. 330, 337 (2022)

(acknowledging "concerns of misleading the jury 'are of lesser import in a bench trial'"). Given these considerations, and as Mr. Cook is a highly experienced appraiser, *see supra*, who intended his "appraisal report [in this case to be] prepared in conformity with the Appraisal Foundation's Uniform Standards for Professional Appraisal Practice," *see* PX21 at VII (Cook Expert Report), the Court in its discretion, *see Kumho Tire*, 526 U.S. at 159 (Scalia, J., concurring), qualifies Mr. Cook as an expert appraiser and denies the government's Motion, ECF No. 69. *See* FED. R. EVID. 702 (permitting witnesses "qualified as [] expert[s] . . . [to] testify . . . if the proponent demonstrates to the court that it is more likely than not that" the "expert . . . will help the trier of fact to understand the evidence or to determine a fact in issue"); *see also Seaboard Lumber*, 308 F.3d at 1302.

## III.    The Government's Valuation Arguments and Trial Testimony

The government alleges "credible evidence [] shows [plaintiff's] property[] market value increased from the BeltLine more than any diminution in value caused by her loss of property rights," Gov't's Pre-Trial Br. at 2, meaning "[p]laintiff is not entitled to compensation from the taxpayers," *id.* at 3. Indeed, the government contends plaintiff's "argument that her property decreased in market value rests solely on her expert appraiser's testimony," "[a]nd that expert's testimony is unreliable and deeply flawed." *Id.* at 1. Thus, the government alleges plaintiff "seeks a windfall payment of more than one million taxpayer dollars after her property value increased substantially due directly to the BeltLine." *Id.* at 3.

### A.    Testimony of the Government's Expert Economist Spencer Banzhaf

The government, in addition to offering the testimony of Ms. Price as described *supra* Section II.A, proffered the expert reports and testimony of Dr. Banzhaf, *see* Tr. at 433:9–500:22, 514:6–640:7 (Banzhaf Testimony), and Edmund Eslava, *see* Tr. at 718:13–764:9, 780:13–915:4 (Eslava Testimony), in support of its argument plaintiff "is not entitled to compensation." Gov't's Pre-Trial Br. at 24–39. Dr. Banzhaf, who provided both affirmative testimony and rebuttal testimony to Mr. Cook, explained he used hedonic modeling to "synthesize [market data] . . . and make [] adjustments for differences between . . . other properties" and the Subject Property to understand the BeltLine's influence on the latter's value. Tr. at 436:22–439:11; *see* DX96 at 2–5 (Banzhaf Expert Report). In his report, Dr. Banzhaf explained his hedonic model of incorporating a "difference-in-difference [approach] combine[s] the strengths of comparisons across space and comparisons over time" to "isolate[] the differential effect of the BeltLine on properties near the BeltLine." DX96 at 6 (emphasis omitted); *see* Tr. at 440:1–22. Specifically, for his work in this case, Dr. Banzhaf "obtained real estate data from the Fulton County[] Tax Assessor's office," relying "primarily on transactions for multifamily homes" but "consider[ing] supplemental evidence from single-family houses." DX96 at 7; *see id.* at 9–10 (describing the "2,275 observations on which [Banzhaf] performed the analysis"). Most importantly, Dr. Banzhaf computed "the distance to the BeltLine" for each of the more than 2,000 parcels in his analysis, "placed buffers around the BeltLine[,] . . . and determined whether the property was less than 0.25 miles distance from the BeltLine, 0.25–0.5 miles, 0.5–1 mile, 1–1.5 miles, 1.5–2 miles, or greater than 2 miles." *Id.* at 8; *see* Tr. at 448:21–449:13. After running seven hedonic models, Dr. Banzhaf concluded, "even under the most conservative assumptions, . . . values increased at [Ms.] Price's property as a result of the BeltLine project along the Northeastern

segment." *Id.* at 16.  Dr. Banzhaf testified at trial, however, "the BeltLine, according to [his] model, did have an impact on the property values [for properties between .25 and .5 miles from the BeltLine].  And that effect it had on those properties was higher than the direct effect it had on properties within . . . a quarter mile[, including adjacent properties like Ms. Price's]."  Tr. at 460:22–461:8.  Regarding Mr. Cook, Dr. Banzhaf testified the former's analysis was flawed particularly because it did not enable him to "isolate the effects of the [BeltLine] trail" on the Subject Property.  Tr. at 516:3–8.

### 1.    Plaintiff's Motion in Limine to Strike Dr. Banzhaf

On 12 April 2024, plaintiff filed an amended motion in limine to strike Dr. Banzhaf as an expert.  *See* Pl.'s Mot. in Limine to Strike Banzhaf ("Banzhaf MIL"), ECF No. 112.  Plaintiff renewed this objection at trial, noting "plaintiff objects [to Dr. Banzhaf's testimony] . . . [f]or the reasons set forth in [plaintiff's] motion [in] limine that had previously been filed."  Tr. at 441:10–18; *see also* Tr. at 486:11–17 (detailing plaintiff's objection to Dr. Banzhaf's rebuttal testimony is "on the basis [] iterated in [the] motion in limine to strike Dr. Banzhaf").  The Court "allow[ed] [Dr. Banzhaf's] testimony, understanding that the motion in limine" was pending.  Tr. at 444:11–17; *see* Tr. at 486:24–487:4.

In plaintiff's Motion, plaintiff alleges "Dr. Banzhaf's opinion regarding the value of [p]laintiff's taken property is not helpful . . . [as] Dr. Banzhaf fails to address the effect that direct *adjacency* to the [BeltLine] had on [p]laintiff's property [because he instead] studie[d] the effect of the [BeltLine] on properties *nearby but not necessarily adjacent* . . . and conclude[d] that such *nearby* properties increased in value due to the presence of the BeltLine."  Banzhaf MIL at 1 (emphasis in original).  Plaintiff also alleges "the Court should not allow Dr. Banzhaf to testify regarding . . . his rebuttal report that criticizes [plaintiff's expert Mr. Cook] because [a]s an economist, Dr. Banzhaf is unqualified to provide opinions regarding Mr. Cook's . . . appraisal."  *Id.* at 2.  According to the government, however, "Dr. Banzhaf's analysis . . . is highly relevant to the question of how much compensation (if any) [p]laintiff is owed" because it "show[s] that, contrary to [p]laintiff's claims, the BeltLine had a positive impact on [p]laintiff's property market value."  Gov't Banzhaf Resp. at 1 ("Banzhaf Resp."), ECF No. 115.  Indeed, the government emphasizes Dr. Banzhaf's analysis "confirms that the market value increase . . . was a direct benefit to [p]laintiff as opposed to simply a general benefit to the community" and explains Dr. Banzhaf's analysis "shows where direct benefits end and general benefits begin—at one mile from the BeltLine."  *Id.* at 2.  Finally, as to Banzhaf's rebuttal report, the government argues "Dr. Banzhaf is qualified to offer critiques of Mr. Cook's work based on his impressive qualifications as an economist."  *Id.* at 3.

As explained *supra* Section II.B.1, the considerations animating FRE 702 "are of lesser import in a bench trial."  *Seaboard Lumber*, 308 F.3d at 1302 (stating the "concerns [underlying the standard in *Daubert*] are of lesser import in a bench trial"); *see In re Zurn Pex Plumbing Prods. Liability Lit.*, 644 F.3d at 613 ("The main purpose of *Daubert* exclusion is to protect juries from being swayed by dubious scientific testimony.  That interest is not implicated . . . where the judge is the decision maker."); *Gilead Sciences*, 160 Fed. Cl. at 337 (acknowledging "concerns of misleading the jury 'are of lesser import in a bench trial'").  Although the Court must still ensure "the *Daubert* standards of relevance and reliability" are met, *see Seaboard Lumber*, 308

F.3d at 1302, the risk involved in admitting "opinions [the opposing party alleges] will not help the trier of fact to understand the evidence or to determine a fact in issue," Banzhaf MIL at 8, is of less concern where the judge alone "might be exposed to confusing and unreliable expert testimony," s*ee Seaboard Lumber*, 308 F.3d at 1301; *see also Gilead Sciences*, 160 Fed. Cl. at 337. Here, although plaintiff alleges "Dr. Banzhaf is not an appraiser, so . . . his opinions stray from relevance," Banzhaf MIL at 8, the government is correct Banzhaf's model incorporating single and multifamily data from across Fulton County "go[es] to the heart of the central question before the Court, namely, how did the taking . . . change the market value of [p]laintiff's property," Banzhaf Resp. at 11. While plaintiff is correct Dr. Banzhaf's model may not show the direct benefit of the BeltLine as the government alleges, Banzhaf MIL at 1, this determination is up to the Court as the fact finder, *see Seaboard Lumber*, 30 F.3d at 1302; *Sarif Biomedical LLC v. Brainlab, Inc.*, 725 Fed. Appx. 996, 1000 (Fed. Cir. 2018); *see also Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) (acknowledging it is "the province of the [fact finder] to weigh the credibility of competing witnesses" (quoting *Kansas v. Ventris*, 556 U.S. 586, 594, n.*)). Finally, regarding Dr. Banzhaf's rebuttal testimony to Mr. Cook's expert report, for a witness to be considered an expert, the witness need merely be "qualified . . . by knowledge, skill, experience, training, or education." FED. R. EVID. 702; *see Daubert*, 509 U.S. at 592 (noting "an expert witness is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation . . . on [the] assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"). Here, Dr. Banzhaf holds multiple advanced degrees in economics, *see* DX95 at 1 (Curriculum Vitae of Dr. Banzhaf), has "32 years [of] experience as an economist looking at . . . the value of environmental quality, local amenities, and other neighborhood effects," Tr. at 433:15–25, and has conducted related studies into "the effect of reforms to local schools on property values, changes in crime rates on property values, and the closing of nearby facilities that had been emitting toxic air pollution [on property values]," Tr. at 436:1–21. Thus, to the extent Dr. Banzhaf—although not an appraiser—employs his "knowledge, skill, [and] experience," FED. R. EVID. 702, to opine that Mr. Cook's analysis "lack[s] credibility" due to its failure to line up with the results of Banzhaf's "economic analysis," the Court finds Dr. Banzhaf sufficiently qualified to provide such testimony, s*ee Daubert*, 509 U.S. at 592. The Court accordingly denies plaintiff's Motion, ECF No. 112.

## B.    Testimony of Plaintiff's Listing Agent Frank Clementi

The government next offered the fact testimony of Mr. Clementi, a licensed real estate agent focusing on commercial properties in the Atlanta area. *See* Tr. at 642:7–643:6 (Introduction of Mr. Clementi by the government). Mr. Clementi served as plaintiff's "listing agent" during the 2021 sale of the Subject Property. *See* 644:1–10. Mr. Clementi explained the Subject Property was listed and sold for $2,000,000. *See* Tr. at 645:23–647:11. Plaintiff and Mr. Clementi determined this listing price by "looking at comparables in the area," especially as the Subject Property is within "walking distance of the [] BeltLine," contains a triplex, and "was income producing at the time [of sale]." *Id.* Mr. Clementi, however, noted, "like what Yogi Berra said, [n]obody goes [to the BeltLine] anymore, because it's so crowded," but caveated properties near the BeltLine have "become more valuable." Tr. at 643:17–644:3.

1.    **Plaintiff's Motion in Limine to Exclude the Testimony of Mr. Clementi and All Evidence of Plaintiff's 2021 Sale of the Subject Property**

On 27 October 2023, plaintiff filed a motion in limine to "disallow evidence of the March 2021 sale of [the Subject Property] and . . . [the] opinion testimony from Frank Clementi." *See* Pl.'s Mot. to Exclude 2021 Sale Evidence at 1 ("Pl.'s Mot. to Exclude"), ECF No. 66. Plaintiff renewed this objection at trial. *See* Tr. at 641:9–25. According to plaintiff, "a sale of [the Subject Property] in March 2021 has no bearing on its value [on the date of the taking] in September 2017 . . . [so p]laintiff objects to the introduction of any evidence regarding the March 2021 sale of [p]laintiff's property on the grounds of relevancy." Pl.'s Mot. to Exclude at 3. Further, plaintiff argues the "Court should not allow Mr. Clementi to provide any testimony regarding the BeltLine's effect on" the Subject Property because Mr. Clementi is a "non-retained expert witness" and is not "an expert in" properties along the BeltLine to allow him to testify "regarding his opinion about the BeltLine's effect on multi-family residential properties." *Id.* at 3–4; *see id.* at 5 (explaining "Mr. Clementi has no data to support [his] opinions."). According to the government, as "the purpose of the just compensation trial is to determine the fair market value of the [Subject Property] on the date of taking in 2017 . . . the sale of the very property at issue just a few years [later] . . . is highly relevant." Gov't's Resp. to Pl.'s Mot. to Exclude 2021 Sales Evidence at 1, ECF No. 83. Further, the government clarifies Mr. Clementi is a "fact witness who [] testif[ied] based on his personal knowledge" and "not [as] an expert witness." *Id.*

During his testimony, Mr. Clementi admitted he has not sold "any properties adjacent to the BeltLine" other than the Subject Property, Tr. at 643:4–7, but merely presented his firsthand observations of the BeltLine, *see* Tr. at 643:7–644:3, and his experience working with and assisting plaintiff in selling her property, *see* Tr. at 644:4–665:1. Despite plaintiff's speculation, Mr. Clementi *did not* provide "opinion[s] about the BeltLine's effect on multi-family residential properties" or act as a "non-retained expert witness." *C.f.* Pl.'s Mot. to Exclude at 3–4. Mr. Clementi therefore acted as a proper fact witness pursuant to FRE 602, which merely requires fact witnesses to testify as to their "personal knowledge of the matter" at issue. *See* FED. R. EVID. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony.").

Turning next to the subject of Mr. Clementi's testimony, the 2021 sale of the Subject Property, and all evidence related thereto—the Uniform Appraisal Standards for Federal Land Acquisitions, Section 4.4.2.4.7, Sales After the Date of Valuation (6th ed. 2016) ("Yellow Book") notes: "In partial acquisitions, post-acquisition sales that reflect the influence of the government project *can be highly comparable in valuing the remainder property after acquisition*." Yellow Book at 131 (emphasis added); *see* JX18 (Copy of Yellow Book). For example, "[as explained by the 8th Circuit,] '[s]uch sales should be particularly useful when the measure of [compensation] . . . is the difference between the market value before and after imposition of an easement.'" Yellow Book at 131 (emphasis added) (quoting *United States v. 1129.75 Acres of land in Cross & Pointsett Ctys.*, 473 F.2d 996, 999 (8th Cir. 1973)). While not binding, the Yellow Book's guidance—coupled with FRE 401's language—suggests evidence and testimony regarding the sale of the Subject Property in 2021, which occurred shortly after

the date of the taking and "imposition of [the] easement," are sufficiently relevant to determining the Subject Property's value in its after condition and are therefore admissible. *See 1129.75 Acres of land*, 473 F.2d at 999; FED. R. EVID. 401 ("Evidence is relevant if . . . it has *any tendency* to make a fact [of consequence] more or less probable than it would be without the evidence." (emphasis added)). As with all evidence, the Court will afford this evidence only the weight justified by its credibility and relevancy. *See Sarif Biomedical*, 725 Fed. Appx. at 1000; *see also Perry,* 565 U.S. at 237 (acknowledging it is "the province of the [fact finder] to weigh the credibility of competing witnesses" (quoting *Kansas v. Ventris*, 556 U.S. 586, 594, n.*)). The Court accordingly denies plaintiff's Motion, ECF No. 66.

### C.    Testimony of Georgia Power Manager Paul Erik Pace

The government's second fact witness, Mr. Pace, is "the manager of a construction department at Georgia Power" with over 18 years of experience. *See* Tr. at 674:3–675:2 (Introduction of Mr. Pace by the government). Mr. Pace testified to the impact of GPC easements on servient properties, noting "[t]hey usually restrict uses of the easement that would prohibit [GPC's] ability to safely operate, maintain, and construct transmission lines in those areas." Tr. at 676:13–25. Mr. Pace noted GPC takes "actions to enforce its easements" for these purposes. *See* Tr. at 676:24–677:2. Looking to GPC's easement over the Subject Property, Mr. Pace explained it was "fairly typical . . . [f]or the time period that it was signed." Tr. at 677:3–17 (discussing JX12 (GPC Easement)). Mr. Pace thus explained the GPC easement "restricts . . . obstructions that may . . . interfere" with the transmission lines on the Subject Property. Tr. at 678:24–679:8.

### 1.    Plaintiff's Motion in Limine to Exclude the Testimony of Mr. Pace

On 18 November 2023, plaintiff filed a motion in limine to exclude certain witnesses identified in the government's preliminary witness list, including the testimony of Mr. Pace. *See* Pl.'s Mot. in Limine to Exclude Certain Witnesses ("Pl.'s MIL to Exclude"), ECF No. 76. The Court discussed plaintiff's Motion in Limine at the 28 March 2024 oral argument and issued an order the same day denying-in-part and staying-part plaintiff's Motion. *See* 28 March 2024 Order, ECF No. 108. The Court subsequently issued an order on 11 April 2024 memorializing its decision to deny-in-part and stay-in-part plaintiff's Motion in Limine. *See* 11 April 2024 Order, ECF No. 111. The Court denied the procedural arguments finding the government properly disclosed the witnesses to plaintiff. *See generally id.* The Court, through party agreement, stayed plaintiff's Motion in Limine regarding exclusion of the testimony for a "myriad of issues, including relevancy, wasting this Court's time, presenting unnecessary and cumulative evidence, and providing improper expert testimony." *Id.* at n.2 (citing Pl.'s MIL to Exclude at 1). Plaintiff decided only to depose Mr. Pace, *see* 22 April 2024 JSR at 10, and he was the only witness at issue in the Motion in Limine to testify at Trial. At trial, plaintiff did not re-raise her objection as to Mr. Pace's testimony. *See* Tr. 674:3–717:5. Accordingly, the Court finds as moot plaintiff's Motion in Limine to Exclude Certain Witness, including Mr. Pace, ECF No. 76.

### D.    Testimony of the Government's Expert Appraiser Edmund Eslava

The government finally offered the testimony of its expert appraiser, Mr. Eslava. *See* Tr. at 718:23–727:7 (Qualification of Mr. Eslava as an Expert by the government). Mr. Eslava "served as an affirmative expert and as a rebuttal expert" for the government, *see* Tr. at 717:8–15, and primarily testified as to his use of "three approaches" to valuing the Subject Property—sales, cost, and income—as well as his additional "estimate[] [of] the value of the site as if it were vacant," Tr. at 747:2–4; *see* Tr. at 754:22–24 (detailing Mr. Eslava's before condition valuation of the Subject Property as one million dollars); *see also* DX68 at 66–148 (Eslava Expert Report) (calculating the value of the Subject Property in the before condition and concluding "the subject property in the before Trails Act Easement condition and as of September 28, 2017, had a Market Value of fee simple estate of $1,000,000"). Mr. Eslava explained the "intent [of the sales comparison approach] is to find comparable sales within the neighborhood that are similar to the property that you are appraising from which you can derive a value for that property." Tr. at 744:18–745:3. He then noted the goal of the cost approach is to determine how much it "costs [] to go out and buy a vacant site and build a similar improvement . . . taking into consideration the depreciation that would be inherent." Tr. at 745:20–25. Finally, Mr. Eslava detailed the income approach, which entails looking at similar rental properties to determine "the present value of th[e] right" to "receive the future income [of the Subject Property] over a reasonable economic life expectancy." Tr. at 746:1–11. After confirming his appraisal "[was] based on the Yellow Book," Mr. Eslava confirmed the "highest and best use determination" is "the most important part of the appraisal process." Tr. at 733:22–734:1–17; *see* Tr. at 733:22–25 (confirming the Yellow Book "require[s] an appraiser to consider highest and best use . . . as improved and as vacant"). Walking through his analysis at trial, Mr. Eslava explained how he "use[d] the results of [the cost approach, income approach, and sales approach] to come to [his] ultimate before-condition valuation" of one million dollars. Tr. at 754:1–25. Mr. Eslava then explained how, using the "same general methodology," Tr. at 755:2–5, he confirmed "as a result of being directly located on the BeltLine," the Subject Property "received a direct benefit" from the taking, Tr. at 763:18–23. He thus concluded the Subject Property's after-condition value was "$1,100,000." Tr. at 764:2; *see* DX68 at 149–208 (Eslava Expert Report).

### 1.    Plaintiff's Motion in Limine to Exclude the Testimony of Mr. Eslava

On 27 October 2023, plaintiff filed a motion in limine arguing Mr. Eslava's "position [set forth in his expert report] simply is not tenable, and . . . should be struck." Pl.'s Eslava Mot. in Limine ("Pl.'s Eslava MIL") at 13, ECF No. 65. Plaintiff further renewed its objection at trial. *See* Tr. at 726:25–727:3. The Court "permit[ted Mr. Eslava] to testify, understanding that the motion in limine [wa]s pending." Tr. at 727:4–6. In its Motion, plaintiff primarily takes issue with Mr. Eslava's conclusion, arguing "[i]t strains all credulity to believe that if [p]laintiff had full use, possession, and control of the property that is now within the BeltLine—as she would have if the government hadn't instead taken her land to create the BeltLine—then such land would have *no value*." Pl.'s Eslava MIL at 2 (emphasis in original). In other words, plaintiff argues Mr. Eslava's opinion plaintiff's property value increased following the taking is "outlandish." *See Id.* at 1. Specifically, plaintiff alleges Mr. Eslava improperly interpreted the Subject Property's Driveway Easement, which led to his allegedly flawed belief plaintiff "would have had no legal access to th[e] land" in the railway corridor had it reverted back to plaintiff. *Id.* at 7. This in turn "render[ed] his ultimate opinions about this case unfounded and unreliable."

*Id.* at 8.  Further, plaintiff argues "Mr. Eslava's opinion, to the extent it relies on the bizarre supposition that the property could not be rezoned unless the [railroad applied for such,] . . . cannot be deemed reliable." *Id.* at 12.  In response, the government alleges "both of [p]laintiff's critiques [of Mr. Eslava's report] go to a fundamental disagreement between the parties' appraisers:  whether in the [b]efore condition . . . the land in the former railroad corridor could be used to house a second apartment building[,] . . . [so] the Court should deny the Motion." Gov't Eslava Resp. at 2–3, ECF No. 81.  Ultimately, the government argues "[b]ecause [p]laintiff's Motion does not go to the admissibility of Mr. Eslava's testimony, and even if it did, Mr. Eslava's testimony satisfies the requirement for admissibility, the Court should deny the Motion."  *Id.* at 3.

As explained *supra* Sections II.B.1 and III.A.1, FRE 702 permits expert testimony by a person with sufficient "knowledge, skill, experience, training or education" if it is "more likely than not that" their expertise "will help the trier of fact to understand the evidence or determine a fact in issue."  FED. R. EVID. 702.  It is undisputed Mr. Eslava "is a[ highly experienced] appraiser," *see* Pl.'s Eslava MIL at 1, providing "his opinions about" the *key* factual issue in this case—"the valuation of the property at issue," *id.*  Thus, although plaintiff moves to exclude Mr. Eslava's testimony pursuant to FRE 702, *see id.* at 2–3, plaintiff presents no grounds on which to do so.  Rather, plaintiff merely argues the Court should disregard Mr. Eslava's testimony because "[i]t is incredible that Mr. Eslava can seriously believe that the 15,000 square feet of land that now sits in the BeltLine would have had no value if it had 'reverted' to [p]laintiff."  *Id.* at 13 (citing Tr. at 121:14–122:4).  It is the Court—not the opposing party—however, who is "entitled to weigh the credibility of an expert's testimony."  *See Sarif Biomedical*, 725 Fed. at 1000; *see also Perry*, 565 U.S. at 237 (acknowledging it is "the province of the [fact finder] to weigh the credibility of competing witnesses" (quoting *Kansas v. Ventris*, 556 U.S. 586, 594, n.*)).  The Court accordingly denies plaintiff's Motion, ECF No. 65.  Additionally, as the Court has denied plaintiff's Motion regarding Mr. Eslava, the Court finds as moot the government's Motion to Strike plaintiff's Reply in support of the Motion in Limine to Strike Eslava as an expert, ECF No. 100.[2]  The Court, in its role as fact finder, will therefore "weigh the credibility of [the parties'] competing witnesses," including the testimony of Mr. Eslava.  *See Sarif Biomedical*, 725 Fed. Appx. at 1000.

## IV.    Plaintiff's Rebuttal Testimony

At trial, plaintiff proffered two experts to rebut the testimony of Dr. Banzhaf and Mr. Eslava.

### A.    Testimony of Plaintiff's Rebuttal Expert Ted Tatos

On rebuttal, plaintiffs offered the testimony of Ted Tatos, *see* Tr. at 915:24–976:2 (Tatos Testimony), "an economist and statistician and [the] Managing Director of Empirical Analytics." PX24 at 1 (Curriculum Vitae of Mr. Tatos).  Mr. Tatos is an adjunct professor "of economics at the University of Utah" and has "over twenty-five years of experience in litigation and

---

[2] The Court notes it previously struck the plaintiff's other Reply at issue in this Motion.  *See* 28 March 2024 Order (striking plaintiff's Motion in Limine to Strike Spencer Banzhaf as an Expert, ECF No. 82, and plaintiff's Reply in support of plaintiff's Motion in Limine, ECF No. 90).

non-litigation consulting." *Id.* In his rebuttal report, Mr. Tatos was "asked to analyze the methodology that Dr. Banzhaf employed and investigate whether his analysis supports the opinions he offers in his report." PX23 at 3 (Tatos Rebuttal Report). Mr. Tatos first testified he does not "find a problem with [Dr. Banzhaf's] use of hedonic regression," even conceding he has "used it before." Tr. at 951:20–24; *see* PX23 at 4 ("I offer no criticism of Dr. Banzhaf's decision to employ hedonic regression analysis."). Mr. Tatos faulted Dr. Banzhaf, however, for his use of data from the Fulton County Computer-Aided Mass Appraisal ("CAMA") database, rather than data from "the Multiple-Listing Service" ("MLS"). *See* Tr. at 932:17–934:18 ("[PLAINTIFF:] In your opinion, was there a more appropriate data source than CAMA data available to Dr. Banzhaf? [TATOS:] Yes. . . . The MLS data . . . [because] it captures the characteristics of the [Subject P]roperty as of the time of the sale . . . [and] it's probably the most commonly used source."); *see also* PX23 at 21. Further, Mr. Tatos contested the usefulness of Dr. Banzhaf's opinions, noting "he only analyzed proximity effects with respect to multifamily properties, like the [Subject P]roperty," not the effects of being *adjacent* to the BeltLine. Tr. at 935:1–936:11. Indeed, Mr. Tatos pointed out Dr. Banzhaf "noted that he did not have enough multifamily properties" in his data set to look at the impact of the BeltLine on adjacent properties, so "he [instead] relied on single-family homes to draw . . . his conclusions regarding adjacency." Tr. at 936:4–11.

### 1.    Government's Motion in Limine to Exclude Certain Testimony of Mr. Tatos

On 27 October 2023, the government filed a motion in limine to "exclude testimony and opinions by Mr. Tatos opining that data obtained from a [MLS] would have been superior and/or more suitable than the specific Fulton County [CAMA] data Dr. Banzhaf used" because "Mr. Tatos's deposition . . . reveal[ed] that his opinions on this matter are unsupported by facts . . . [as] Mr. Tatos admitted in his deposition that he did not look at any actual Georgia MLS data in forming his opinions." Gov't's Mot. in Limine to Strike Tatos at 1 ("Gov't's Tatos MIL"), ECF No. 67. The government renewed this Motion at trial. *See* Tr. at 923:20–924:9. The Court found "Mr. Tatos qualified as an economist to testify on the matters . . . in his rebuttal report, but recognize[d] [] the government's pending [M]otion" so decided to "afford Mr. Tatos'[s] testimony the appropriate weight, subject to the continuing objection." Tr. at 924:3–13. In response to the government's Motion, plaintiff responded "there is [] no evidence [Mr. Tatos's] opinion is not based on sufficient facts or data . . . [as he] has vast experience in the area of statistical analysis and the attributes of [the] particular data set." Pl.'s Tatos Resp. at 2, ECF No. 84. In *Daubert*, the Supreme Court recognized experts are "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation . . . on [the] assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." 509 U.S. at 592. Here, the government alleges Mr. Tatos's opinions regarding the benefits of MLS data over CAMA data are "unsupported by facts or data" because "Tatos did not review any actual MLS data for the Atlanta area" or "for Georgia at all." Gov't's Tatos MIL at 5. At trial, however, Mr. Tatos explained his extensive experience with MLS data. *See* Tr. at 934:4–13. Mr. Tatos's expert report likewise devotes nearly a page explaining the attributes and benefits of MLS databases. *See* PX23 at 23–25. Thus, although Mr. Tatos's opinions regarding the relative benefits and drawbacks of MLS and CAMA data *in Atlanta* may not be "based on firsthand knowledge or observation," Mr. Tatos demonstrated he has a "reliable basis in []

knowledge and experience" to opine on these matters. *Daubert*, 509 U.S. at 592. The Court accordingly denies the government's Motion, ECF No. 67.

### B.    Testimony of Plaintiff's Rebuttal Expert C. David Matthews

Plaintiff proffered Mr. Matthews to rebut the testimony of Mr. Eslava and Dr. Banzhaf. *See* Tr. at 976:18–1057:17 (Matthews Testimony); PX25 (Matthews Rebuttal Report). Mr. Matthews holds a degree in real estate from the University of Tennessee, is licensed as a real estate appraiser in several states—including Georgia—and is a long-time member of the American Institute of Real Estate Appraisers. *See* PX26 at 30–31 (Curriculum Vitae of Mr. Matthews); *see also* Tr. at 978:1–988:15 (Qualification of Mr. Matthews as an Expert by plaintiff).

As a rebuttal appraiser, Mr. Matthews undertook to "opine on the quality of [Mr. Eslava and Dr. Banzhaf's] works, whether they supported it, whether the opinions were reasonable, whether they used the right methodology, and whether they explained themselves in the[ir] report[s]." Tr. at 995:14–19. Mr. Matthews opined he believed both Mr. Eslava and Dr. Banzhaf conducted appraisals, leading him to "review[] them . . . to see if they followed the USPAP . . . and also the Yellow Book." Tr. at 996:1–4. Beginning with Mr. Eslava's report, Mr. Matthews opined he was "kind of stunned that [Mr. Eslava] said you can't use the . . . 15,000 square feet" in the railroad corridor in the before condition due to zoning restrictions and access limitations. Tr. at 997:24–998:23; *see* PX25 at 18 ("A thorough analysis of this somewhere in his 280-page report should have been done rather than just saying development of this 100-ft by 150-ft area is not possible."). Mr. Matthews likewise faulted Mr. Eslava for determining the BeltLine "benefited the [Subject P]roperty by a hundred thousand dollars" without looking at comparable multifamily properties "on a trail." Tr. at 1015:16–1016:6; *see* Tr. at 1016:7–1017:5 ("[PLAINTIFF:]  Did [Mr. Eslava] point to anything else in addition to his sales in the after condition to support the benefit that he found? . . . [MATTHEWS:] [H]e had a survey in there, 24 people. About half of them replied. Most of those said . . . yeah[, a] trail is a benefit in Atlanta, or trails in the area benefit your property . . . . There were no numerical numbers in there and no indication of what people thought . . . . Then he used 10 percent, which happened to [be] the same number that [Banzhaf's] study indicated . . . and he quotes . . . Dr. Banzhaf's study. And if Dr. Banzhaf had done a good job, I think it would be reasonable to use that, but he didn't do a good job.").

Turning to Dr. Banzhaf's study, Mr. Matthews stated Banzhaf's results only "show[] . . . the general benefit [of being near the BeltLine,]" not a special benefit attributed to adjacency. Tr. at 1021:10–1022:6 ("[MATTHEWS:]  If you look at [Dr. Banzhaf's results,] at a quarter mile to a half mile, those are definitely [benefits but they are not] specific. That's the neighborhood. That's the general area, and it shows how high the values are. That's the highest values indicated in his study. And you get a little closer to the trail, and it drops down – from zero to a quarter of a [mile]. The benefit is reduced. So the abutting property – the [Subject P]roperty probably has a general benefit, but it also has damage. Because it's not benefited as much as the properties a quarter mile away, so that's a measure of damage."); *see* PX25 at 15 ("The major error in [Banzhaf's study] . . . is the whole purpose . . . [is] to determine the effects of an abutting

trail[, but] . . . he studied the General Benefits that might accrue to a residential property from a nearby trail.").

### 1.    The Government's Motion in Limine to Strike Certain Testimony by Mr. Matthews

On 27 October 2023, the government filed a motion "in limine to exclude the testimony and report of . . . C. David Matthews[] as it relates to [the government's expert economist] Dr. Spencer Banzhaf."  Gov't Mot. in Limine to Exclude Certain Testimony of C. David Matthews at 1, ECF No. 68.  According to the government, because Mr. Matthews' opinion "that Dr. Banzhaf's report does not comply with the Uniform Standards of Professional Appraisal Practice ('USPAP')" is "based on the incorrect premise that Dr. Banzhaf's report must comply with USPAP," Mr. Cook's testimony as to this opinion should be excluded.  *Id.*  Similarly, the government moved "to exclude Mr. Matthews' opinions that Dr. Banzhaf did not comply with USPAP because they are irrelevant" since "USPAP does not apply to Dr. Banzhaf."  *Id.*  The government renewed these objections at trial.  *See* Tr. at 988:16–989:5.  At trial, as the government raised no objection to Mr. Matthew's status as an expert, the Court found "him qualified as an [expert] appraiser and permit[ted] him to testify as to the contents of his report."  Tr. at 989:13–15.  In response to the [government's objections, plaintiff contends "Mr. Matthews is [a] well[-]qualified [appraiser and therefore] can opine regarding another person's opinions and methodologies relating to valuing real estate, whether that person is an appraiser or not."  Pl.'s Resp. to the Gov't Mot. in Limine to Exclude Certain Testimony of C. David Matthews at 1, ECF No. 86.  Thus, plaintiff alleges it is "entirely appropriate for Mr. Matthews to opine that Dr. Banzhaf's opinions and methodology relating to the value of [the Subject] Property are flawed."  *Id.*

Plaintiff characterizes Mr. Matthews' opinions differently than the government does, and clarifies "Mr. Matthews' opinions . . . are not merely that Dr. Banzhaf does not comply with USPAP. . . .  [Rather,] Mr. Matthews [provides an] apt explanation[] for why Dr. Banzhaf's opinions and methodology do not hold water for appropriately valuing a partial taking of real estate."  *Id.* at 7.  In his rebuttal report, Mr. Matthews concludes both government experts "estimate[d] a market value of the [Subject P]roperty, and their work products are appraisals. They just use different techniques."  PX 25 at 12.  Turning specifically to Dr. Banzhaf, Mr. Matthews opines Dr. "Banzhaf made an appraisal of the property" based upon his chosen methodologies, but Dr. Banzhaf "made a number of methodology errors" as he "does not understand proper appraisal procedures as explained in USPAP and the Yellow Book."  *Id.* at 14.  Mr. Matthews then spends several pages explaining that Dr. Banzhaf's "[l]ack of knowledge of" appraisal standards and "appraisal experience in federal condemnation cases led to multiple errors in his analysis."  *Id.* at 17.  In other words, Mr. Matthews' opinion as to Dr. Banzhaf is not that Banzhaf as an economist *must* adhere to USPAP and the Yellow Book; rather, Mr. Matthews merely alleges that as Dr. Banzhaf's modeling was akin to that performed by appraisers, Dr. Banzhaf's failure to adhere to standard appraisal procedures rendered his work inaccurate.  *See id.* at 13–17.  This testimony as to the alleged failings of the government's expert economist is both highly relevant to this case and, given Mr. Matthews' uncontested qualifications as an appraiser, is sufficiently reliable to warrant the Court to deny the government's Motion, ECF No. 68.  *See* FED. R. EVID. 702 (permitting witnesses "qualified as [] expert[s] . . . [to] testify . . . if

the proponent demonstrates to the court that it is more likely than not that" the "expert . . . will help the trier of fact to understand the evidence or to determine a fact in issue"); *see also Kumho Tire*, 526 U.S. at 159 (Scalia, J., concurring).

## V.    Summary of Expert Testimony as to the Value of the Taking

In sum, the parties' experts argue the following, *see supra* Sections II–IV:

| Expert | Party Affiliation | Before Valuation | After Valuation | Damages | Special Benefit? |
|---|---|---|---|---|---|
| Mr. Cook | Plaintiff | $1,600,000 | $508,040 | $1,091,960 | No |
| Dr. Banzhaf | Government | N/A | N/A | N/A | Yes |
| Mr. Eslava | Government | $1,000,000 | $1,100,000 | $0 | Yes |
| Mr. Tatos | Plaintiff | N/A | N/A | N/A | No |
| Mr. Matthews | Plaintiff | N/A | N/A | N/A | No |

## VI.    Legal Standard for Just Compensation Under the Fifth Amendment Takings Clause as Applied to Rails to Trails Cases

The Takings Clause of the Fifth Amendment provides "private property" may not "be taken for public use, without just compensation." U.S. CONST. amend. V.  This court has jurisdiction over takings claims against the government, including those "that occur pursuant to Section 8(d) of the Trails Act." *Agapion v. United States*, 167 Fed. Cl. 761, 771 (2023); *see Preseault v. I.C.C.*, 494 U.S. 1, 11–17 (1990) ("The Tucker Act provides jurisdiction in the [Court of Federal Claims] for any claim against the Federal Government to recover damages founded on the Constitution, a statute, [or] a regulation . . . . [So i]f there is a taking, the claim is founded upon the Constitution and within the jurisdiction of the Claims Court" (cleaned up)).  In the rails-to-trails context, a Fifth Amendment taking occurs "when government action destroys . . . property rights by converting a railway easement to a recreational trail, if trail use is outside the scope of the original railway easement." *Ladd v. United States*, 630 F.3d 1015, 1019 (Fed. Cir. 2010).  "When the government physically acquires property for a public use, the Takings Clause obligates [it] to provide the owner with just compensation." *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021) ("The government must pay for what it takes."); *see Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973) ("'[J]ust compensation' means the full monetary equivalent of the property taken.  The owner is to be put in the same position monetarily as [they] would have occupied if [the] property had not been taken.").

It is well-settled "just compensation" requires a "determin[ation] . . . [of] monetary equivalence," meaning "the owner is entitled to the fair market value of [the] property at the time of the taking." *Almota Farmers*, 409 U.S. at 474.  This value is generally derived "from 'what a willing buyer would pay in cash to a willing seller'" for the taken property. *Id.*; *see Miller v. United States*, 223 Ct. Cl. 352, 377 (1980) (noting "the legal definition of fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell, and both being reasonably informed as to all relevant facts").  The "sum required to be paid to the owner does not depend upon the

uses to which [the landowner] has devoted [to the] land," rather the Court is to consider "the highest and most profitable [(*i.e.*, best)] use for which the property is adaptable." *Olson v. United States*, 292 U.S. 246, 255–56 (1934); *see Otay Mesa Property, L.P. v. United States* (*Otay Mesa II*), 779 F.3d 1315, 1320 n.4 (Fed. Cir. 2015) ("In valuing real property, a primary consideration is its 'highest and best use'—i.e., its most profitable use."). In sum, the "well-established benchmark for just compensation is the 'fair market value' for the 'highest and best use' of the property." *Agapion*, 167 Fed. Cl. at 772 (quoting *Olson*, 292 U.S. at 255). The property owner is to "be made whole but is not entitled to more." *United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979).

## A. Just Compensation in Partial Acquisitions

"Where the property interest permanently taken is an easement, the 'conventional' method of valuation is the 'before-and-after method,' i.e., 'the difference between the value of the property before and after the [g]overnment's easement was imposed. . . . Th[is] method[ is] not exclusive," however, and "there may be appropriate alternative valuation methods for the taking of an easement." *Otay Mesa Property, L.P. v. United States* (*Otay Mesa I*), 670 F.3d 1358, 1364 (Fed. Cir. 2012). In other words, in rails-to-trails cases, "the 'measure of damages for just compensation [is generally] . . . the difference between the [fair market] value of plaintiffs' land unencumbered by a railroad easement and the [fair market] value of plaintiffs' land encumbered by a perpetual trail use easement subject to possible reactivation as a railroad.'" *Technical College of the Low Country v. United States*, 145 Fed. Cl. 408, 426 (2019) (quoting *Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011)).

In employing the "before and after method," also known as the Federal Rule, *see Agapion*, 167 Fed. Cl. at 772, "courts generally examine evidence provided by expert appraisers." *Technical College*, 145 Fed. Cl. at 426. According to the Yellow Book, which "set[s] forth the guiding principles, legal requirements, and practical implications for the appraisal of property in all types of federal acquisitions," *id.* at 3, in employing the before and after method in partial acquisitions "the appraiser develops opinions of both the market value before the acquisition and the market value after the acquisition," *id.* at 37. This procedure enables "courts to calculate a reasonable measure of [just] compensation by deducting the remainder or after value from the larger parcel's before value." *Id.* "Regardless of the specific format of the appraisal report, an appraiser's task is ultimately to 'estimate the value of the land for its highest and best use, as if . . . available for such use.'" *Technical College*, 145 Fed. Cl. at 427 (quoting the Yellow Book at 19). Appraisers may arrive at their estimates using "the cost approach, sales comparison approach, or income capitalization approach." *Id.* (citing the Yellow Book at 19–23).

## VII. Findings of Fact

The Court earlier performed limited fact finding relying on stipulated facts, *see supra* Section I.B, related to case background.[3]  The Court turns now to outstanding questions of fact related to the highest and best use of the Subject Property.

### A.    Highest and Best Use of the Subject Property in the Before Condition

The parties agree the Subject Property's "highest and best use in the [b]efore [c]ondition is for multifamily residential development."  *See* Pl.'s Post-Trial Br. at 8; PX21 22–23 (Cook Expert Report) (concluding the "[h]ighest and best use is concluded to be for multifamily residential development to the optimum density likely to be approved, which is the seven unit range"); Gov't's Post-Trial Br. at 46; Tr. at 742:21–743:5 (Eslava) (describing the highest and best use in the before condition "as a triplex for the eastern portion of the site").  The parties, however, dispute the specifics of such use.  Specifically, plaintiff contends the "highest and best use of th[e Subject Property] as though vacant is for [a] multifamily development" with "a total of seven units."  Tr. at 249:11–22 (Cook).  The government, however, argues "in the [b]efore condition" the Subject Property's "highest and best use . . . was as a triplex apartment." Gov't's Post-Trial Br. at 46 (citing Tr. at 742:21–743:5 (Eslava)); *see* DX68 at 61–69 (Eslava Expert Report).

"The highest and best use of a parcel is 'the reasonably probable and legal use of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.'"  *Lost Tree Village Corp. v. United States*, 787 F.3d 1111, 1119 (Fed. Cir. 2015) (quoting *Olson v. United States*, 292 U.S. 246, 255 (1934)); *see* Yellow Book at 64 ("The four tests of highest and best use are physically possible, legally permissible, financially feasible, and highest value.").

For the following reasons, the Court disagrees with plaintiff constructing four additional units on the Subject Property—for a total of seven units—in the before condition is a "reasonably probable and legal use" of the parcel.  *See Lost Tree Village*, 787 F.3d at 1119.

First, the experts disagree as to the physical possibility of constructing seven units on the Subject Property.  At trial, plaintiff's appraiser Mr. Cook testified, although the Subject Property "is . . . gently sloping at the back," it "can accommodate development on the more general slopes[,] has access by a private drive[, and] is served by all necessary utilities[,] [so] subject to not putting improvements in the area of the [sewer] easement," building up to seven units "can be done."  Tr. at 247:10–17 (Cook).  In contrast, the government's appraiser Mr. Eslava contends Mr. Cook's determination one could "develop the subject site with a total [of] 7 units" is an "extraordinary assumption," including because Cook "fail[ed] to properly analyze the . . . site's existing poor accessibility" and "the railroad corridor's lack of access."  DX69 at 6–7 (Eslava Rebuttal Report); *see* Tr. at 738:24–739:21 (Eslava) (discussing the Subject Property's proximity

---

[3] Section VII contains the Court's principal findings of fact pursuant to Rule 52(a) of the Rules of the United States Court of Federal Claims ("RCFC").  Although the Court conducted limited fact finding *supra* Section I.B, the background discussed in that Section is generally undisputed and primarily derived from the parties' jointly stipulated facts.  In Section VII, the Court derives its findings of fact from the parties' Joint Stipulation, the trial transcript, the exhibits admitted into evidence during trial, and matters of which the Court is permitted to take judicial notice pursuant to FRE 201.  *See* FED. R. EVID. 201 (detailing when the Court may take judicial notice of adjudicative facts).

to the adjacent "bridge wall extension[] and . . . [the property's] steep topography"); *see also* DX69 at 62 (Eslava Rebuttal Report).

As the Subject Property already contains a triplex, *see supra* Section II.B, the parties' dispute is over whether it is "physically possible," *see Lost Tree Village*, 787 F.3d at 1119, to accommodate four additional units in the property's before condition. Concerning size, plaintiff is correct a second multi-family structure *could* be developed on the Subject Property. There is a triplex on the eastern 9,000 square feet of the property (what is now the remainder), suggesting the western 15,770 square feet is suitably large enough for a four-unit multifamily structure. *See* PX21 at 22 (Cook Expert Report) (noting "there is a 45.13' wide area on the east and a 100' wide area on the west where buildings could be accommodated"); Tr. at 742:21–743:5 (Eslava). The government's experts likewise did not dispute Mr. Cook's contention the Subject Property is "served by all necessary utilities," Tr. at 247:10–17 (Cook), rendering construction of up to seven units possible. According to the government's appraiser Mr. Eslava, however, opportunities for development on the "western portion of the" Subject Property—where a hypothetical second multifamily development would go—are limited because there are "no opened or identified access [points thereto] . . . except possibly through the" existing driveway easement. DX68 at 62 (Eslava Expert Report); *see infra* (discussing driveway easement). Further, the "western portion [of the Subject Property] . . . lies beneath the bridge crossing of Montgomery Ferry Drive, NE," *id.*, and according to Mr. Eslava, this suggests development may be difficult. The Court agrees the western portion of the Subject Property's location adjacent to and beneath the Montgomery Ferry bridge, *see id.* at 16, renders construction of an additional, likely larger structure difficult. Indeed, as exhibited by the photographs in plaintiff's exhibit 6, *see generally* PX6 (Plaintiff's Photographs of Subject Property), the western half of the Subject Property lies largely beneath the Montgomery Ferry Drive bridge, thereby making it seemingly difficult or impossible to develop the land to add an additional four-unit building as suggested by plaintiff.

As to access, the parties dispute how hypothetical tenants of an additional four-unit development on the Subject Property would reach their homes. *Compare* Gov't's Post-Trial Br. at 23 (contending "the proposed additional four-unit building would lack street access"), *with* Pl.'s Post-Trial Br. at 4 (acknowledging "[p]laintiff accessed [all of the Subject Property] by using the Driveway Easement without objection") *and id.* at 9 (suggesting "a new access point [] could be constructed" if need be). Indeed, at trial Mr. Cook testified the "[o]riginal [driveway] easement" could likely be used to access a new construction on the Subject Property as it was initially "designed for three single family homes" but "now accommodates nine dwellings[, s]o it does not appear there's a limitation on the use of Ms. Price's total property, including the" western half. Tr. at 250:2–14 (Cook). Mr. Cook later opined "an alternative route [to access the Subject Property] [c]ould be [constructed] in or near th[e]' GPC "power line corridor." Tr. at 250:19–251:4 (Cook). First, the Court agrees with plaintiff it *might* be possible to access an additional structure on the Subject Property through the existing driveway easement as it bestows "unto the present and future owners and occupants of . . . [403] Montgomery Ferry Dr., NE . . . a permanent easement to use a paved drive and parking area." Pl.'s Post-Trial Br. at 37; *see* PX8 (Driveway Easement). This suggests occupants of the hypothetical seven units *could* access the Subject Property via the driveway easement *if* such an additional four-unit development was not given a separate street number. There is no evidence, however, such a development would be

- 24 -

part of 403 Montgomery Ferry Drive, N.E., and, as such, there is no evidence a new construction development would be within the scope of the driveway easement. *See* JX3 (Driveway Easement) (creating an easement "for ingress and egress and drive-way purposes for the present and future owners and occupants of . . . 403, 407, and 413 Montgomery Ferry Drive, N.E., Atlanta, Georgia"). Indeed, as explained in Mr. Eslava's rebuttal report, "the easement is silent as to whether "it can be used to provide access to the land in the former railroad corridor," particularly if a building on such land were to be assigned a separate street address. DX69 at 5 (Eslava Rebuttal Report); *see* Tr. at 789:24–791:3 (Eslava) ("[GOVERNMENT:] In your experience would a new apartment building have its own street address? [ESLAVA:] I would think so, yes, sir."); *see also* Tr. at 789:13–23 (Eslava) (detailing Mr. Eslava's discussion of whether a new construction would be part of 403 Montgomery Ferry Dr. and explaining "I would not say it was not possible, but . . . it is not very probable"). Further, with respect to a new driveway, Mr. Pace testified while "driveways and other paved surfaces are [generally] allowed under power lines," *see* Tr. at 714:4–4 (Pace), meaning the GPC easement does not categorically forbid the construction of a new driveway between plaintiff's triplex and the Montgomery Ferry Drive bridge, "regular driveways aren't built to handle the weight of [Georgia Power's] utility vehicles" and GPC "might . . . seek to have [a new driveway] installed to a higher grade" to allow for GPC to utilize its easement, Tr. at 716:10–19 (Pace). Additionally, as explained by Mr. Eslava at trial, any new driveway would need to accommodate not only a steep "12-foot grade drop," but also contend with the entrance for the new driveway being "maybe 150 feet . . . from" the Montgomery Ferry Drive "bridge crest" with limited-to-no visibility of other drivers coming across the bridge, both of which could lead to "a tremendous safety hazard" as cars attempt to "enter and leave the" Subject Property, Tr. at 790:15–791:21 (Eslava); *see also* Tr. at 1042:16–19 (Matthews) ("[GOVERNMENT:] [I]n both in your testimony and in your report, you did note that the property does have a steep topography, correct? [MATTHEWS:] Yes."). Thus, the Court finds it would be both highly dangerous and unfeasibly to construct a new driveway on the Subject Property. This, coupled with the presence of the bridge and narrow scope of the existing driveway easement, renders it unlikely it would be "physically possible," *see Lost Tree Village*, 787 F.3d at 1119, to construct an additional four-unit structure on the Subject Property.

Turning to whether it is "legally permissible" to construct seven units on the Subject Property, the Court first considers questions of zoning. Yellow Book at 64; *Lost Tree Village*, 787 F.3d at 1119; *see Technical College*, 145 Fed. Cl. at 430 ("The experts agree that Main Campus is zoned for both single- and multi-family development . . . ."). The Subject Property is zoned RG-3-C, or "Residential General-Sector 3-Conditional." *See* Gov't's Post-Trial Br. at 7 (citing DX5 at 3 (2010–11 Zoning Adjustment for the Subject Property)). RG-3-C zoning limits "development . . . to three residential units." DX5 at 4 (2010–11 Zoning Adjustment for the Subject Property). As such, the Subject Property, as currently zoned, cannot legally accommodate more than three units. Tr. at 1156:2–1157:25 (Plaintiff); *see United States v. 33.92356 Acres of Land*, 585 F.3d 1, 7 (1st Cir. 2009) ("If a claimed [highest and best] use is prohibited by zoning, the property owner must show that it is reasonably probable that the relevant restrictions will be removed in the reasonably near future." (citation omitted)). Although plaintiff's expert appraiser Mr. Cook opined "rezoning the balance of the property . . .

- 25 -

is probable" to accommodate additional units,[4] PX21 at 20–21 (Cook Expert Report), Mr. Cook did not present evidence "show[ing] that it is reasonably probable that the relevant [zoning] restrictions" could be removed. *33.92356 Acres of Land*, 585 F.3d at 7. As Mr. Eslava pointed out, *see* DX69 at 4 (Eslava Rebuttal Report), the Yellow Book proscribes specific methods "[a]n investigation of the probability of rezoning should include," Yellow Book at 20. These methods include, among other items: conducting "interviews of zoning administrators and members of the . . . body that make[s] final zoning determinations;" "investigati[ng] [] neighborhood attitudes concerning rezones;" and "review[ing] all of the rezoning activity of nearby property." *Id.* Mr. Cook, despite his conclusion the property could be rezoned, did not undertake any of these actions. Indeed, at closing arguments, plaintiff acknowledged Mr. Cook did not "actually set out the ordinances" related to rezoning in his report or "explicitly set out" the process required to rezone the land in the former railroad corridor. Tr. at 1156:23–1157:25 (Plaintiff) ("[PLAINTIFF:] I think Mr. Eslava may have [discussed the process for rezoning] in his testimony, but I don't believe that . . . was explicitly set out in Mr. Cook's report."). As a result, the Court cannot conclude it is "reasonably probable that the relevant [zoning] restrictions" could be removed. *See 33.92356 Acres of Land*, 585 F.3d at 7. It is therefore not "legally permissible" to construct more than three units on the Subject Property. *See* Yellow Book at 64; *see also Technical College*, 145 Fed. Cl. at 430.

The Court's finding regarding the legal impermissibility of constructing seven units on the Subject Property in the before condition is further supported by the restrictions imposed by the GPC easement.[5] Indeed, at trial, the government's witness Mr. Pace explained GPC does not "allow [most permanent structures] in [its] easement areas," including "sheds [and] houses," Tr. at 694:14–16 (Pace), and any obstructions impacting GPC's ability to "safely operate, construct, and maintain" its infrastructure, Tr. at 713:23–714:3 (Pace). The restrictions imposed by the GPC easement "along the western side of the property," Tr. at 728:2–4 (Eslava), therefore further suggest construction of a second multi-family structure on the Subject Property is not "legally permissible," Yellow Book at 64; *see also Technical College of the Low Country*, 145 Fed. Cl. at 430.

Although the experts do not appear to dispute the financial feasibility of constructing seven units on the Subject Property in the before condition, *see* PX21 at 23 (Cook Expert Report); DX69 at 6–11, 62–63 (Eslava Rebuttal Report), the physical impossibility and legal impermissibility discussed *supra* require the Court to find the highest and best use of the Subject Property in the before condition to be a three-unit multi-family development, *see Lost Tree Village*, 787 F.3d at 1119 ("The highest and best use of a parcel is 'the *reasonably probable and legal use* of vacant land or improved property, which is physically possible, appropriately

---

[4] The land in the former railroad corridor "that is made a [hypothetical] part of the before condition parcel" was "zoned R-4 single-family residential" on the date of the taking. *See* PX21 at 20 (Cook Expert Report). Although the government's expert appraiser Mr. Eslava contended this land is "not zoned," the government could not explain the basis for this assertion. *See* Tr. at 1161:7–23 (Government).
[5] At closing argument, the parties explained the Georgia Power easement moved into the former railroad corridor following the taking in this case "to consolidate the line with a single owner," thereby removing this encumbrance from the remainder. *See* Tr. at 1165:12–24 (Plaintiff). While this may appear to be a benefit bestowed upon plaintiff by virtue of the taking and construction of the BeltLine, the government did not raise this argument. Further, as the easement was not moved until over one year after the date of the taking, it is not relevant to the Court's valuation analysis.

supported, financially feasible, and that results in the highest value.'") (emphasis added); Yellow Book at 64; *see also Sarif Biomedical LLC v. Brainlab, Inc.*, 725 Fed. Appx. 996, 1000 (Fed. Cir. 2018) (explaining the Court is "entitled to weigh the credibility of [] expert[s'] testimony"); *Perry v. New Hampshire*, 565 U.S. 228 at 237 (2012) (acknowledging it is "the province of the [fact finder] to weigh the credibility of competing witnesses" (quoting *Kansas v. Ventris*, 556 U.S. 586, 594, n.*)).

### B.    Highest and Best Use of the Subject Property in the After Condition

In the after condition, the parties agree "multiple family residential use is considered the highest and best use." DX68 at 154 (Eslava Expert Report); *see id.* at 153 (explaining the highest and best use of the Subject Property could be "single or multiple family residential development"); PX21 at 34 (Cook Expert Report) (explaining the "[h]ighest and best use for the encumbered remainder is unchanged [from multifamily residential] . . . [but t]he material changes in the after condition are the reduction in size of usable land area, a modestly higher ratio of steeper land, and the addition of the" BeltLine). The Court accordingly finds the highest and best use of the Subject Property in the after condition is multi-family residential, accommodating no more than three-units given the Subject Property's zoning and other related considerations discussed *supra* Section VII.A. *See Lost Tree Village*, 787 F.3d at 1119 ("The highest and best use of a parcel is 'the reasonably probable *and legal use* of vacant land or improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value.'"); *see also* Yellow Book at 64; *Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1061 (Fed. Cir. 2001) ("The court is given the task of determining a fair market valuation and its choice is accorded discretion."); *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("[The Federal Circuit] is unwilling to restrict the trial courts to any single basis for determining fair market value. [Trial] courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case."). In determining this highest and best use, as the fact finder, the "Court is entitled to weigh the credibility of an expert's testimony," *Sarif Biomedical*, 725 Fed. Appx. at 1000 (citation omitted), and "weigh the credibility of competing witnesses," *Perry*, 565 U.S. at 237 (citation and quotation omitted).

## VIII.  Just Compensation for the Taking of Plaintiff's Property

With the Subject Property's highest and best use determined, *see supra* Section VII, the Court now addresses the value of plaintiff's property taken for the BeltLine project. The question before the Court is what, if any, impact did the taking of 15,000 square feet of plaintiff's property and the construction of the BeltLine have on the market value of the Subject Property. Specifically, the Court must determine the difference between the price of the Subject Property in its before condition—a 24,770 square foot parcel improved by a triplex—and its condition after the taking—a 9,770 square foot parcel improved by a triplex abutting the BeltLine and its on-ramp. As noted *supra* Section II, plaintiff argues she is entitled to $1.1 million in damages. The government, however, contends the "Court has ample evidence to award zero compensation to" plaintiff. *See* Gov't's Post-Trial Br. at 1. According to the government, the BeltLine was a "special benefit" to plaintiff which allegedly increased the after-condition market value of the Subject Property above its value in the before condition. *See*

Gov't's Pre-Trial Br. at 9.  The government argues the "Fifth Amendment does not allow plaintiff to be paid *more* than the established diminution of the" Subject Property and since the "special benefit" caused the value of the Subject Property in the after-condition to be greater than the before-condition value, plaintiff should receive no compensation.  *See id.* (emphasis added). As the "existence or absence of special and direct benefits turns not on the specifications of the government project, but on its impact on the market," Yellow Book at 163, the Court next evaluates the parties' expert reports and testimony to determine—based upon market data— "whether the market value of the remainder was [specially and directly] increased" by the imposition of the BeltLine, *id.* (quoting *United States v. Trout*, 386 F.2d 216, 223–24, n.9 (5th Cir. 1967)).  The Court accordingly reviews the market data presented by the parties to ensure plaintiff is "made whole but is not [awarded] more," *United States v. 564.54 Acres of Land*, 441 U.S. 506, 516 (1979), or less than the sum required to put plaintiff "in the same position monetarily as [s]he would have occupied if [her] property had not been taken," *Almota Farmers Elevator & Warehouse Co. v. United States*, 409 U.S. 470, 473–74 (1973).

### A.    The Application of the Scope of the Project Rule and the Doctrine of Special and General Benefits[6]

At closing arguments, the parties disputed the mechanics of, and interplay between, the scope of the project rule and the doctrine of special and general benefits.[7]  The Court now addresses these theories in turn.

### 1.    The Scope of the Project Rule

As both parties agreed, the scope of the project rule—*i.e.*, the traditional rule, which holds condemned property should be valued as if the broader project for which the property was condemned had not been contemplated—does "not allow a landowner to receive a higher value for the portion of [land] tak[en] because the overall land in the area" became "more valuable." Tr. at 1169:16–24 ("THE COURT:  So Scope of the Project Rule would not allow a landowner to receive a higher value for the portion of taking because the overall land in the area is just a lot more valuable.  [PLAINTIFF:]  Correct. . . .  [GOVERNMENT:]  [Y]es.").  This is because the "previous condemnation of adjacent property when it is known that the subject property will likely be partially taken as a part of the same project."  Tr. at 1166:10–20.  The government, however, conflated the scope of the project rule with special benefits and argued courts must always "think about project influence."  *See* Tr. at 1175:6–17 (Government); *see also* Tr. at

---

[6] This Section VIII.A. constitutes the Court's conclusions of law pursuant to RCFC 52(a)(1):  "In an action tried on the facts, the court must find the facts specially and state its conclusions of law separately.  The findings and conclusions may be stated on the record after the close of the evidence or may appear in an opinion or a memorandum of decision filed by the court."

[7] At closing arguments, plaintiff alleged for the first time there may be a difference between the state/local project (the BeltLine) and the federal project (the NITU) and suggested only the latter might trigger the notice required for the scope of the project rule to apply.  *See* Tr. at 1177:19–1178:15 (Plaintiff).  Plaintiff did not, and has not in previous argument before the Court, however, explained whether and how this might impact the Court's compensation determination.  Despite this alleged distinction between the two projects, plaintiff also conceded the scope of the project rule should not impact the Court's analysis because all properties selected by the experts were not influenced by the project(s) at issue.  *See* Tr. at 1177:5–18 (Plaintiff) (describing the scope of the project rule here as "a nonissue").

1173:5–17 ("[GOVERNMENT:]  So [the Yellow Book] notes that 'Project influence on market value normally must be disregarded . . . but partial acquisitions present a special situation . . . [where t]he measure of compensation . . . [should be] considered for the after value.").  Despite this confusion, the Court agrees with the parties when "value [was] added to the property taken" in the before condition "by the action of the public authority in previously condemning adjacent lands . . . . the owner . . . should not be allowed an increased value for his lands which are ultimately to be taken."  *See United States v. Miller*, 317 U.S. 369, 375–77 (1943).  In other words, per the scope of the project rule, if an owner's "lands were probably within the scope of the project from the time the [g]overnment was committed to it," the government "ought not pay any increase in value arising from the known fact that the lands probably would be condemned."  *Id.*; *see also* Yellow Book at 145–51.

## 2.    General and Special Benefits

At closing arguments, the parties did not agree on the definition of general or special benefits.  With respect to general benefits, while plaintiff agreed "a general benefit occurs when a government project increases the value of all or most nearby lands, regardless of whether they suffered a partial taking as part of the project's construction," *see* Tr. at 1185:5–10 (Plaintiff), the government qualified this definition by noting it must not be "read to extinguish the fact that a property impacted by a taking could still experience that same [general] benefit [which] would be . . . considered in [adjusting] compensation," *see* Tr. at 1184:7–12 (Government).  Rather than a benefit inuring to the community at large, *see Hendler v. United States*, 175 F.3d 1374, 1380 (Fed. Cir. 1999), the government argued "[g]eneral benefits are . . . things that can't really even be quantified," *see* Tr. at 1201:23–1202:3 (Government).  Although, when pushed on this definition of a general benefit with a hypothetical, the government appeared to concede general benefits may sometime be quantifiable:

> [THE COURT:]  If the [g]overnment were to construct a reservoir out in the middle of nowhere . . . which, in turn, increased a lot of property that was otherwise out in the middle of nowhere, but now we have this nice, large recreational lake, the properties that are . . . let's say a quarter mile away, close by to the new boat ramp . . . those properties would be receiving a general benefit[?]

> [GOVERNMENT:]  Yes.

Tr. at 1185:14–24 (Government).  Ultimately, however, the government—contrary to plaintiff, *see* Tr. at 1185:11–13 (Plaintiff)—could not agree "general benefits which inure to the community at large do not offset damages" because, per the government, "it depends on how [the general benefit] impact[s] the property bringing a takings claim," Tr. at 1184:22–1185:1 (Government).  Indeed, in a subsequent response related to the Court's reservoir hypothetical, the government suggested "there could be some examples of an increase that is conferred on the property being taken, as well as . . . [on] somebody a quarter mile away . . . but that does not mean that the [] benefit experienced by the person whose property is taken is cancelled out."  Tr. at 1186:23–1187:5 (Government).

The parties initially agreed special benefits are those benefits "specific to the landowners who suffer[ed] the partial taking" as the benefits arise "by virtue of the [landowner's] remaining properties' adjacency to the project." *See* Tr. at 1186:17–1187:17 (detailing agreement between the parties). Returning to the reservoir hypothetical, the government confirmed "a landowner whose quarter acre was condemned to construct the reservoir, but whose remaining land is now [waterfront property] . . . would accrue a special benefit" in contrast to those properties "near but not on the reservoir." Tr. at 1187:24–1188:5 (Government). The parties likewise agreed "multiple parcels can receive the same special benefit from a single project if they're all part of the same taking." *See* Tr. at 1189:23–1190:15 (noting parties' agreement). In its closing argument, the government clarified it does not define "special" as "above and beyond the general," rather, the government argues a *special* benefit arises merely when there is "an increase [in the Subject Property's market value], period." Tr. at 1192:4–10 (Government). According to the government, "if there's an increase [in the Subject Property's market value from the government project], [it] would offset compensation," regardless of whether the increase is experienced community-wide or only by the properties abutting the government project as a result of a partial taking. *See* Tr. at 1192:4–10 (Government). In the end, the government agreed the doctrine of special benefits permits a court to "offset damages from a partial taking [only] when the property subject to the taking increases in market value due to [its] direct relationship" with the government project. *See* Tr. at 1189:6–11 (Government). Nonetheless, the government argued there would be "[n]o compensation" in the following hypothetical scenario:

> [THE COURT:] So let's say that [a] brownstone two miles . . . from the subway station is worth half a million dollars, but now [a new] subway station is coming to the block, [and the brownstone is] worth three-quarters of a million dollars with the subway station right in the front yard [after a partial taking], but the rest of the [properties on the] block [located] a hundred feet away from the subway station but [without] the station right in the front yard, all those brownstones are worth a million dollars. . . . No compensation?

> [GOVERNMENT:] Yes. . . . because on the whole there's an increase.

Tr. at 1205:22–1209:15. Although plaintiff articulated the difference between special and general benefits clearly, *see* Tr. at 1209:1–4 ("[PLAINTIFF:] If you're in the vicinity [of the project] and you're getting the same benefit [as the property subject to the taking], that's a general benefit."), the government confused the concepts and emphasized "if there's an[y] increase, [it] would offset compensation;" Tr. at 1192:4–10 (Government).

As discussed in the Yellow Book, the results of the before-and-after method of valuing a partial taking should "include[] the value of the property acquired as well as any compensable damages and/or direct (special) benefits to the remainder property." Yellow Book at 37. As explained by the Supreme Court more than a century ago, "[w]hen the part not taken" in a partial acquisition "is left in such shape or condition as to be in itself of less value than before, the owner is entitled to additional damages on that account." *United States v. Grizzard*, 219 U.S. 180, 185 (1911); *see Agapion*, 167 Fed. Cl. at 772 ("[W]hen the taking is only partial . . . just compensation includes 'compensable damages,' which is the 'diminution in value of the owner's remaining property resulting from the taking.'" (citation omitted)). In other words, when

determining compensation for a partial taking, courts need to consider both the value of the property taken by the government *and* the value of any "diminution in value of the owner's remaining property resulting from the taking" (*i.e.*, damage to the remainder). *Agapion*, 167 Fed. Cl. at 772 (emphasis added); *see also Hendler*, 175 F.3d at 1383 ("[J]ust compensation under the takings clause of the Constitution includes . . . the damage to the remainder resulting from the taking.").

Regarding post-taking benefits to a property, in the late-nineteenth century, the Supreme Court established the doctrine of "special benefits," to account for benefits "which arise directly and proximately to the remaining land" in a partial acquisition "as a result of the public work on the part taken, due to the peculiar relation of the land in question to the public work." *Hendler*, 175 F.3d at 1380. As Justice Gray explained in *Bauman v. Ross*:

> *When . . . the part which [the owner] retains is specially and directly increased in value by the public improvement, the damages to the whole parcel by the appropriation of part of it are lessened.* If, for example, by the widening of a street the part which lies next the street, being the most valuable part of the land, is taken for the public use, and what was before in the rear becomes the front part, and upon a wider street, and thereby of greater value than the whole was before, it is neither just in itself, nor required by the constitution, that the owner should be entitled both to receive the full value of the part taken, considered as front land, and to retain the increase in value of the back land, which has been made front land by the same taking.

167 U.S. 548, 574–75 (1897) (emphasis added). The Court further advised:

> The [C]onstitution of the United States contains no express prohibition against considering benefits in estimating the just compensation to be paid for private property taken for the public use; and, for the reasons and upon the authorities above stated, no such prohibition can be implied . . . [W]hen part of a parcel of land is appropriated to the public use . . . the tribunal vested by law with the duty of assessing the compensation or damages due to the owner, whether for the value of the part taken, or for any injury to the rest, shall take into consideration, by way of lessening the whole or either part of the sum due [to the owner], any special and direct benefits . . . caused by the [project] to the part not taken.

*Id.* at 584. Thus, when "special benefits . . . *inure specifically to the landowner who suffered the partial taking and are associated with the ownership of the remaining land*," the compensation to which the landowner is entitled is lessened. *Hendler*, 175 F.3d at 1380 (emphasis added). As "the [Claims C]ourt stated[], 'if governmental activities inflict slight damage upon land in one respect and actually confer great benefits when measured in the whole, to compensate the landowner further would be to grant him a special bounty.' . . . [T]he rule takes its force from the underlying equitable principle that the [g]overnment's obligation is, to the extent possible . . . [to] restore the landowner to the position he was in absent any government action." *Id.* at 1382 (quoting *Bartz v. United States*, 633 F.2d 571, 576–78 (1980)). As recognized by plaintiff in closing arguments, both the Supreme Court and the Federal Circuit have authorized trial courts

to offset damages caused by partial takings only if the "landowners who suffered the partial taking," *see Hendler*, 175 F.3d at 1380, are conferred a "benefit[]," *id.* at 1382, in the form of their retained land "increas[ing] in value [because of its adjacency or otherwise unique relationship to] the public improvement," *Bauman*, 167 U.S. at 574–75; *see Hendler*, 175 F.3d at 1380. The government is therefore incorrect "if there's an[y] increase, [it] would offset compensation," Tr. at 1192:4–10, as special benefits depend upon the direct relationship between the remaining lands not subject to the taking and the government project, *Hendler*, 175 F.3d at 1380.

In contrast, "benefits that inure to the community at large" from the public work are to be considered "general" and do not impact just compensation. *See Hendler*, 175 F.3d at 1380 ("[R]esulting benefits that are more or less common to all lands in the vicinity of the land taken are general."). In other words,"[t]he kind of benefit [(*i.e.*, a general benefit)], which is not allowed to be [considered] for the purpose of" offsetting damages, "is that which comes from sharing in the common advantage and convenience of increased public facilities, and the general advance in value of real estate in the vicinity by reason thereof." *United States v. River Rouge Improvement Co.*, 269 U.S. 411, 416 (1926) (citation omitted). Thus, contrary to the government's assertion "an increase [in market value] that is conferred on the property being taken" and on "somebody a quarter mile away" can be a special benefit, Tr. at 1186:23–1187:5 (Government), both the Supreme Court and the Federal Circuit have clarified benefits accruing to those properties "in the vicinity" of the government project, meaning those "common to all lands" nearby, are by definition general, *see River Rouge*, 269 U.S. at 416; *Hendler*, 175 F.3d at 1380.

The government is correct; "[d]istinguishing between special and general benefits is not always an easy task." *Hendler*, 175 F.3d at 1380. Courts therefore often look to instructive examples. *See id.* For instance, the Federal Circuit has pointed to the guidance provided by the Supreme Court's analysis in *River Rouge*. *See id.* at 1380–82. *River Rouge*, in relevant part, states:

> *The benefit is not less direct and special to the land of the petitioner, because other estates upon the same street are benefited in a similar manne*r. The kind of benefit, which is not allowed to be estimated for the purpose of such deduction, is that which comes from sharing in the common advantage and convenience of increased public facilities, and the general advance in value of real estate in the vicinity by reason thereof. The advantages of more convenient access to the particular lot of land in question, and of having a front upon a more desirable avenue, are direct benefits to that lot, giving it increased value in itself. It may be the same, in greater or less degree, with each and every lot of land upon the same street. But such advantages are direct and special to each lot. They are in no proper sense common because there are several estates, or many even, that are similarly benefited.

269 U.S. at 416 (emphasis added); *see* Yellow Book at 161–65 (explaining "any direct and special benefits must be *set off* against the total compensation") (emphasis added). In other words, a special benefit can be communal so long as it only inures to those properties sharing the same "peculiar relation . . . to the public work." *Hendler*, 175 F.3d at 1380.

In sum, the government's argument—a property owner can accrue a special benefit when other landowners "in the area [not subject to the taking] see [an equal or greater] increase in value" due to the taking and "imposition" of the government project—is *not* rooted in caselaw. *See* Tr. at 1191:16–19 (Government); *see also* Tr. at 1202:23–1203:10 ("[GOVERNMENT:] [Y]ou can't disregard a reasonably quantifiable benefit simply because others in the area [away from the project] received a greater benefit."). Rather, binding Supreme Court and Federal Circuit precedent draw a clear line between special and general benefits: a special benefit "inure[s] *specifically to the landowner who suffered the partial taking*" and is "associated with *ownership of the remaining land*," while a general benefit "inure[s] *to the community at large*" and so is "common to all lands in the vicinity" of the government project. *Hendler*, 175 F.3d at 1380 (emphasis added). Further, the Supreme Court has directly refuted the government's contention a general benefit "can't really [] be quantified," *see* Tr. at 1201:23–1202:3 (Government), explaining a general benefit often takes the form of a "general advance in the value of real estate in the vicinity" of the government project. *River Rouge*, 269 U.S. at 416. To determine whether the Subject Property accrued a special benefit by virtue of the BeltLine, the Court must review the parties' expert testimony to determine whether the market data supports plaintiff's trail-*adjacent* land—after "suffer[ing] the partial taking"—experienced an increase in market value different than the properties only in the "vicinity" of the project. *See Hendler*, 175 F.3d at 1380 (explaining special benefits only accrue to lands that suffered the partial taking because of their "peculiar relation . . . to the public work").

Finally, "[t]he *extent* of a special and direct benefit is a fact question to be determined by the [Court upon review of the work performed by the parties'] appraiser[s]." Yellow Book at 163 (emphasis added). The before-and-after method therefore considers the entire tract "*before* acquisition excluding any enhancement or diminution from the project, and the market value of the remainder *after* acquisition *including* any special benefit or diminution due to the government project." *Id.* at 164 (emphasis added). Here, the Court must use its discretion to determine the fair market value of the land at issue. *See Barrett Refining Corp. v. United States*, 242 F.3d 1055, 1061 (Fed. Cir. 2001) ("The court is given the task of determining a fair market valuation and its choice is accorded discretion."); *Seravalli v. United States*, 845 F.2d 1571, 1575 (Fed. Cir. 1988) ("[The Federal Circuit] is unwilling to restrict the trial courts to any single basis for determining fair market value. [Trial] courts necessarily must have considerable discretion to select the method of valuation that is most appropriate in the light of the facts of the particular case."). In doing so, as the fact finder, the "Court is entitled to weigh the credibility of an expert's testimony," *Sarif Biomedical LLC v. Brainlab, Inc.*, 725 Fed. Appx. 996, 1000 (Fed. Cir. 2018) (citation omitted), and "weigh the credibility of competing witnesses," *Perry v. New Hampshire*, 565 U.S. 228 at 237 (2012) (citation and quotation omitted); *see Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1302 (Fed. Cir. 2002) (stating the "concerns [underlying the standard in *Daubert*] are of lesser import in a bench trial").

### B.    Value of the Subject Property in the Before Condition

In the before condition, plaintiff's expert Mr. Cook suggested the Subject Property has a "value of $1,600,000." Tr. at 257:19–22 (Cook); *see* PX21 at 2 (Cook Expert Report). In calculating this value, however, Mr. Cook began with the erroneous assumption the highest "and

best use is . . . for multifamily residential development to the optimum density . . . which is *in the seven unit range*." PX21 at 23 (emphasis added); *see supra* Sections II.B, VII.A.  As a result, when Mr. Cook conducted his "sales comparison approach," focused on allegedly "like sales," which shared the Subject Property's  "highest and best use," Tr. at 251:5–16 (Cook); *see* PX21 at 25, Mr. Cook selected five properties with between seven and twenty units, *see* PX21 at 25 (summarizing the attributes, including unit number, of Mr. Cook's selected sales).  These "sales range[d] in price from $44.05 to $103.90 per square foot prior to" Mr. Cook's adjustments thereto.  *See id.* (Cook) (explaining he made adjustments regarding typical "elements of comparison" such as "market condition, location, various physical factors, and use/density of development").  Assuming the "intensity of use or density potential" of the Subject Property was approximately seven units—or "12.3 units per acre"—in the before condition, Mr. Cook then made "adjustments" to his five selected comparable sales to compensate for their differences in density potential as related to the Subject Property.  *See id.* at 27.  The magnitude of Mr. Cook's already-unquantifiable qualitative adjustments was incorrect, however, as the *actual* density potential of the Subject Property in the before condition was only approximately 5.26 units per acre (*i.e.*, 3 units on the current 0.57-acre Subject Property, adjusted for a one-acre property). *See supra* Section III.A.

        Further, although all five of Mr. Cook's selected properties are in the city of Atlanta, they are in significantly different regions of the city compared to the Subject Property.  *See* PX21 at 25.  While Mr. Cook adjusted for location, *see id.* at 26, his unquantifiable qualitative adjustments related to location are unclear as the justification for all location-related adjustments is as follows:

> The subject is in a popular neighborhood with strong property values.  Sale #1 is very well located on Piedmont Avenue, which is considered superior to the subject. Downward adjustment is made.  Sale #2 is in an inferior neighborhood characterized by a mix of older commercial and residential uses.  Sale #3 is in an inferior neighborhood east of the subject property. Upward adjustment is made. Sale #4 is considered to have offsetting location factors.  Sale #5 is in an area of higher density development, including new construction.  It is superior to the subject and downward adjustment is applied.

*Id.* at 26–27.  The dearth of explanation for these adjustments, as well as the lack of a numerical explanation for how substantial of an upward or downward adjustment Mr. Cook made to each property, renders his valuation analysis uncertain.  *See* Tr. at 348:1–7 ("[GOVERNMENT:] Because your adjustments are qualitative and not quantitative, a reader cannot know . . . how much you adjusted each land sale for the factors listed?  [COOK]: Yes.").

        When conducting a sales comparison approach, an expert appraiser should "study the market for sales of properties with the same highest and best use as the subject property that are as close in proximity and time as possible."  Yellow Book at 26.  The "consideration and weight accorded to sales of other lands is determined by the reliability of the data collected and verified by the application of the three tests of proximity (in time, in location, and in physical and economic similarity)."  *Technical College of the Low Country v. United States*, 145 Fed. Cl. 408, 437 (2019) (citing Yellow Book at 40) (internal quotation marks omitted).  Further, the

"preferred method of adjusting comparable sales is through the use of *quantitative* adjustments whenever adequate market data exists to support them." *Id.* (citing Yellow Book at 21) (internal quotations omitted) (emphasis added). Here, Mr. Cook not only looked to comparable sales with significantly different density potential and, relatedly, different zoning than the Subject Property, *see* Gov't's Post-Trial Br. at 28–29 (noting the "higher densities of Mr. Cook's Before sales leads to inflated values, because, as Mr. Cook acknowledged [at trial], 'you pay more for a property with a higher density[]' Tr. [at] 412:10–11 [(Cook)]"), he also selected properties in vastly different sections of Atlanta, *see supra* Sections II.B, VII.A. Although Mr. Cook applied "[q]ualitative adjustments" to account for these differences allegedly "due to the difficulty of quantifying adjustments within a reasonable degree of professional certainty," PX21 at 28 (Cook Report), Mr. Cook failed to explain *why* insufficient market data existed to apply proper quantitative adjustments, *see Technical College*, 145 Fed. Cl. at 437; *see also* Tr. at 348:7–13 ("[COOK:] [Y]ou can't quantify an adjustment and give a percentage when there's not enough data."). Given Mr. Cook's failure to use comparable sales in his analysis and his use of unclear qualitative adjustments when attempting to compensate for the lack of similarity between his selected properties and the Subject Property, *see supra*, the Court finds Mr. Cook's before-value Subject Property testimony unpersuasive. *See Ultimo v. Sec'y of Health & Hum. Srvs.*, 28 Fed. Cl. 148, 152 (1993) ("Simply because a witness is found qualified to testify as an expert does not mean that the trier of fact must accept [the witness'] testimony." (citation omitted)); *see also Sarif Biomedical LLC v. Brainlab, Inc.*, 725 Fed. Appx. 996, 1000 (Fed. Cir. 2018) (explaining the "Court is entitled to weigh the credibility of an expert's testimony" (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 929 (Fed. Cir. 2012))).

At closing arguments, plaintiff agreed if the Court were to discredit Mr. Cook's valuation analysis, the Court could instead rely on the allegedly comparable properties evaluated by Mr. Eslava. *See* Tr. at 1217:10–1218:23 (Plaintiff). The Court accordingly turns to Mr. Eslava's before-condition analysis.

In contrast to Mr. Cook, who focused primarily on the comparable sales approach, *see supra*, the government's expert Mr. Eslava used "three [primary] approaches" to value the Subject Property—sales, cost, and income. Tr. at 747:2–4 (Eslava); *see* Tr. at 754:22–24 (Eslava) (stating Eslava's before-condition valuation of the Subject Property was one million dollars); *see also* DX68 at 66–148 (Eslava Expert Report) (calculating the value of the Subject Property in the before condition and concluding "the subject property in the before Trails Act Easement condition and as of September 28, 2017, had a Market Value of fee simple estate of $1,000,000"). With respect to his sales-comparison approach—which yielded an estimated before-condition value of $1,103,000, *see* DX68 at 132—Mr. Eslava endeavored to find "improved sales similar to the [S]ubject [Property] in the Piedmont area" of Atlanta, *id.* at 108. Mr. Eslava then "verified [each sale] with either current multiple listing information, a principal of the sale, a broker, or a knowledgeable third party." *Id.* Within Mr. Eslava's four comparable sales, however, only one property—number two, 1773 Monroe Drive, NE—is located in the same neighborhood as the Subject Property. *See id.* at 113. All other properties, similar to Mr. Cook's selected comparable sales, are in different regions of the city. *See id.* at 109–27. Although Mr. Eslava subsequently made a variety of adjustments on these sales to account for differences between the sales and the Subject Property, *see id.* at 128–31, Mr. Eslava *did not* adjust for locational differences, and thus did not properly account for the disparity in

neighborhoods, *see* DX68 at 128–31.  Although at least two of Mr. Eslava's sales are not zoned for multifamily use, *see* Tr. at 1213:15–1215:10 ("[THE COURT:]  They're all multifamilies . . . but they're not zoned for that."), all his sales:  (1) are otherwise marketed and used as multifamily residential constructions; (2) were built around the same time as the Subject Property; and (3) contain improvements within approximately 2,000 square feet of the Subject Property's triplex, *see* DX68 at 126.  The Court accordingly finds Mr. Eslava's sales-comparison approach in the before condition credible.  Specifically, Comparison Property 2 is noteworthy because it is in the same neighborhood as the Subject Property and is zoned and used as a triplex.  *See id.* at 113–14.  Comparison Property 1 is likewise noteworthy because it is zoned and used as a multifamily residential property and is similar in size to the Subject Property.  *See id.* at 109–10 (describing Comparison Property 1 as a quadplex in a separate neighborhood of Atlanta); *see also Sarif Biomedical*, 725 Fed. Appx. at 1000 (explaining the "Court is entitled to weigh the credibility of an expert's testimony" (citing *Celsis In Vitro*, 664 F.3d at 929)).

As "the cost approach is usually not as affable in older improvements," Mr. Eslava "primarily [relied] upon the value indications of both the sales comparison approach and the income approach[]" to calculate the before-condition value of the Subject Property.  Tr. at 747:2–11 (Eslava).  This is because the cost approach "is considered as being more reliable when the improvements are relatively new, void of any significant amount of depreciation, and are the highest and best use for the cite."  DX68 (Eslava Expert Report).  While Mr. Esalva found the Subject Property to be "considered average plus to good quality in regard to both materials and workmanship and [] very competitive with other residential rental properties in the immediate area," he determined the improvements "exhibit[ed] depreciation in the form of minor curable and incurable physical deterioration."  *Id.*  Due to the depreciation and deterioration, Mr. Eslava determined the cost approach was "not . . . the most reliable method of analyzing the [S]ubject [Property's] current market value."  *Id.*  Mr. Eslava nevertheless found the approach "very meaningful" and calculated a before-condition valuation under the cost approach of $898,000.  *Id.*; *see* Section III.D.

Turning to the "income approach," which is "based on the principle of anticipation, that value is the present worth of anticipated future . . . income . . . to be derived from ownership of the property rights being appraised," Mr. Eslava conducted "direct comparisons with other similar properties which are being rented as of the effective date of the appraisal."  DX68 at 133 (emphasis omitted).  Mr. Eslava first looked to the Subject Property itself and then reviewed three multi-family properties (two triplexes and a quadplex) located in Atlanta for a total of four properties.  *See id.* at 134–38.  The three other rental properties Mr. Eslava evaluated feature both smaller units and lower monthly rents than the Subject Property.  *See Id.*  As with the comparable sales properties selected by both Mr. Cook and Mr. Eslava, all properties in Mr. Eslava's "income approach" are in different neighborhoods than the Subject Property.  *See id.* at 138.  In coming to his conclusion regarding the Subject Property's before value based upon its "ability to produce an income stream over a reasonable economic life expectancy," *id.* at 133, Mr. Eslava used the rental price per square foot of his selected properties and adjusted estimated costs and the likelihood of vacancies to determine the Subject Property's "stabilized net income," *id.* at 139–42.  Mr. Eslava then undertook to "estimat[e] the market value of the [S]ubject [Property] via . . . an overall capitalization rate using a mortgage equity method."  DX68 at 143.  He likewise attempted to estimate the overall capitalization rate by "extract[ing] it from" his selected

"comparable sales." *Id.* at 146.  Ultimately, Mr. Eslava settled on an "overall capitalization rate of 5.00%," leading to an estimated market value of the Subject Property in the before condition of $883,000 via the income approach.  *Id.* at 146.  The Court finds Mr. Eslava's income-approach analysis credible, particularly as his selected rental properties included the Subject Property, *id.* at 139, and analyzed a variety of similar rental properties with per square footage rental rates near, above, and below that of the Subject Property, *id.*; *see Sarif Biomedical*, 725 Fed. Appx. at 1000 (explaining the "Court is entitled to weigh the credibility of an expert's testimony" (citing *Celsis In Vitro*, 664 F.3d at 929)).

In light of Mr. Eslava's before-condition valuation—which plaintiff agreed was proper if the Court discredited Mr. Cook's determination that the Subject Property's before-condition highest and best use was a seven-unit multifamily construction—the Court adopts Mr. Eslava's valuation and finds the before value of the Subject Property was $1,000,000.  *See* DX68 at 66–148 (Eslava Expert Report) (calculating the value of the Subject Property in the before condition and concluding "the subject property in the before Trails Act Easement condition and as of September 28, 2017, had a Market Value of fee simple estate of $1,000,000"); Tr. at 1217:10–1218:23 (Plaintiff).  Mr. Esalva determined the before-condition value was $1,000,000 after reconciling his three valuation approaches—(sales, cost, and income.  *See* Tr. at 864:10–17.  As explained *supra*, Mr. Eslava relied primarily on the sales-comparison and income-capitalization approaches in valuing the property because the cost approach, although illuminating, was not as reliable for the Subject Property.  *See* Tr. at 907:9–19; *see also* Tr. at 754:7–11 (explaining Mr. Eslava put the least amount of emphasis on the cost approach).  In making his final valuation of the Subject Property, Mr. Eslava emphasized the "final value estimate takes into consideration the general tendencies of both the buying and selling public to deal in round numbers whenever possible." DX68 at 148 (Eslava Expert Report).  Mr. Esalva's final before-condition valuation was therefore—by dealing in "round numbers"—the rounded average of the comparable sales approach, which yielded a valuation of $1,103,000, *see supra*, and his income approach, which yielded a valuation of $883,000, *see supra*:  ($1,103,000 + $883,000) ÷ 2 = $993,000 ~ $1,000,0000.  *See* Tr. at 754:22–24 (detailing Mr. Eslava's before condition valuation of the Subject Property as one million dollars); DX68 at 66–148 (Eslava Expert Report) (calculating the value of the Subject Property in the before condition and concluding "the subject property in the before Trails Act Easement condition and as of September 28, 2017, had a Market Value of fee simple estate of $1,000,000").  Further supporting Mr. Eslava's before-condition valuation, $1,000,000 is also between Mr. Eslava's most credible comparable sales—Comparison Properties 1 (~$980,000) and 2 (~$1,119,000).  *See* DX68 at 126 (Eslava Expert Report); *see also supra* Section III.D.  Accordingly, at 24,770 square feet of land, the Subject Property's before-condition price per square foot of land is $40.37 (Before-Condition Price ÷ Total Square Footage of Land = Price Per Square Foot of Land).  *See Sarif Biomedical*, 725 Fed. Appx. at 1000 (explaining the "Court is entitled to weigh the credibility of an expert's testimony" (citing *Celsis In Vitro*, 664 F.3d at 929)).

## C.    Whether the BeltLine is a Special Benefit to the Subject Property

As explained *supra* Section III, the government alleges "credible evidence [] shows [the] market value [of plaintiff's property] increased from the BeltLine more than any diminution in value caused by her loss of property rights," Gov't's Pre-Trial Br. at 2, thereby excluding

plaintiff from any "compensation from the taxpayers," *id.* at 3. In other words, the government argues if plaintiff has already inured a special benefit by virtue of the remainder's location abutting the BeltLine, then any additional damages awarded to plaintiff would be a "windfall payment" because "her property value increased substantially due directly to the BeltLine." *Id.* at 3. In support of its argument plaintiff already received a special benefit from the partial taking and resulting trail adjacency, the government points primarily to the analysis of its economic expert, Dr. Banzhaf. Indeed, at trial, the government contended Dr. Banzhaf's "hedonic modeling" analysis shows "a clearly defined benefit to the subject property by virtue of its location on the BeltLine." Tr. at 34:10–35:10 (Government). Although contending Mr. Eslava's report also identified the alleged special benefit conferred on the Subject Property by virtue of the partial taking and construction of the BeltLine, the government failed to point to any quantitative analysis of this special benefit Mr. Eslava allegedly found. *See* Tr. at 1216:23–1217:9 ("[THE COURT:] Did [Mr. Eslava] perform a quantitative analysis . . . to determine the subject property in the after condition should receive the 10 percent bump? [GOVERNMENT:] I think he *looked at* some quantitative analysis, including Dr. Banzhaf's report and . . . the 2021 sale [of the Subject Property].") (emphasis added). Thus, as "[t]he *extent* of a special and direct benefit is a fact question," Yellow Book at 163 (emphasis added), the Court reviews Dr. Banzhaf's quantitative study of "2,275 observations" of "multifamily residences sold [within three miles of the BeltLine] between 2010 and 2020" to determine whether plaintiff received a special benefit. *See* DX96 at 9–10 (Banzhaf Expert Report); *see id.* at 13 n.4 (explaining as there were "not enough sales of multifamily residential buildings near the BeltLine to distinguish the effects of adjacency to the BeltLine from the effects on other very nearby properties," Dr. Banzhaf "supplemented [his] investigation with an examination of detached single-family homes and . . . individual condominium units").

In performing his study, Dr. Banzhaf engaged in a "difference-in-differences analysis [to] isolate[] the differential effect of the BeltLine on properties near[by]." *Id.* at 6. As explained *supra* Section III.A, Dr. Banzhaf "placed buffers around the BeltLine . . . and determined whether the property was less than 0.25 miles distance from the BeltLine, 0.25–0.5 miles, 0.5–1 mile, 1–1.5 miles, 1.5–2 miles, or greater than 2 miles." *Id.* at 8; *see* Tr. at 448:21–449:13 (Banzhaf). The results of Dr. Banzhaf's model are as follows:



*See* DX106-5 (Banzhaf's Hedonic Model Analysis).[8]  In short, Dr. Banzhaf concluded properties abutting or within 0.25 miles of the BeltLine increase in value by "$151,000."  *See* Tr. at 620:15–24 (Banzhaf).  Per Dr. Banzhaf, however, the BeltLine's impact "on those properties [between 0.5 and 1 mile from the BeltLine] was higher than the direct effect it had on properties within . . . a quarter mile" of the BeltLine.  *See* Tr. at 460:22–461:4 (Banzhaf).  Indeed, Banzhaf's study shows a positive effect from the BeltLine on property values for all lands within "one mile."  Tr. at 620:23 (Banzhaf).

 To confer a special benefit, a government project must "increase in value" the "part of the [Subject Property] which [the owner] retains."  *Bauman*, 167 U.S. at 574–75.  In other words, special benefits "inure *specifically* to the landowner who suffered the partial taking and are associated with the ownership of the remaining land."  *Hendler*, 175 F.3d at 1380 (emphasis added); *see supra* Section VIII.A.  In contrast, a general benefit is one "more or less common to all lands in the vicinity of the taken land."  *Id.*  Indeed, when there is a "general advance in [the] value of real estate in the vicinity" of a government project, such is "not allowed to be [considered] for the purpose of" reducing compensation for land taken.  *See River Rouge*, 269 U.S. at 415.  Here, Dr. Banzhaf's empirical analysis reveals a quintessential general benefit.  Although Dr. Banzhaf found the value of properties between 0 and 0.25 miles—including adjacent properties but also those up to a quarter mile away—from the BeltLine increased in value as a result of the government project, *see* DX106-5 (Banzhaf's Hedonic Model Analysis), *all* properties within one mile of the BeltLine received an "advance in value," *see River Rouge*, 269 U.S. at 415.  Thus, no benefit "inure[d] specifically to the landowner"—plaintiff—"who suffered the partial taking," rather the benefit is "common to all lands in the vicinity of the taken land."  *Hendler*, 175 F.3d at 1380; *see Hardy v. United States*, 141 Fed. Cl. 1, 25 (2018) ("[I]n general, landowners place value on having trails nearby, but do not want trails adjacent to (or

---

[8] The Court notes the government agreed the minor uptick in value for adjacent properties in Dr. Banzhaf's study relative to those within 0.25 miles of the BeltLine is not "statistically significant" as it is a mere "0.7 . . . percent" increase.  Tr. at 1205:2–21.  Further, this uptick is generally inapplicable to the instant case as it "was based on [Dr. Banzhaf's] single-family home analysis."  *Id.*

running through) their properties."). In fact, according to Dr.Banzhaf, those properties *near but not abutting* the taking and trail received a greater benefit than properties like plaintiff's which suffered the taking and are now trail adjacent. *See* Tr. at 460:25–461:9 (Banzhaf) (explaining the BeltLine had an impact on property values from 0 to 0.5 miles and "the effect it had on [] properties [from 0.25 to 0.5 miles] was higher than the direct effect [the BeltLine] had on properties within [] a quarter mile"); *see also supra* Sections III.A, IV.A–B. Although the government alleged this finding of a benefit within one mile of the BeltLine is insufficient evidence of a general benefit as "Atlanta [is the] market" for purposes of distinguishing between general and special benefits, Tr. at 1199:7–12 (Government), no evidence supports this claim as caselaw merely defines a general benefit as one common to "*all lands in the vicinity of the taken land*," *Hendler*, 175 F.3d at 1380 (emphasis added)—not just one common to the entire metropolitan area in which the taking took place. Dr. Banzhaf's study thus suggests, rather than constituting a special benefit, trails are a *special detriment* to adjacent properties, bestowing a lesser benefit on those properties abutting them than on others nearby. *See* Tr. at 460:25–461:9 (Banzhaf); DX106-5 (Banzhaf's Hedonic Model Analysis) (demonstrating a greater impact on properties 0.25 to 0.5 miles from the BeltLine compared to properties 0 to .25 miles from the BeltLine); *see also supra* Sections III.A, IV.A–B. The Court accordingly finds plaintiff's property did not accrue a special benefit by virtue of the partial taking and installation of the BeltLine in the former railroad corridor, instead, the BeltLine was a general benefit conferred upon all nearby properties up to a mile away from the project. *See River Rouge*, 269 U.S. at 415; *Hendler*, 175 F.3d at 1380.

## D.    Value of the Subject Property in the After Condition

The final issue for the Court to consider is the value of the Subject Property in the after-condition, when the government already took "[t]he [15,000 square feet] of the Subject Property subject to the Trails Act easement," leaving 9,770 square feet "contain[ing] improvements including [the] tri-plex consisting of three multifamily apartment units." J. Statement of Stip. Facts at 3. As the market data does not demonstrate the Subject Property received a special benefit from the government's taking and subsequent BeltLine adjacency, the Court must determine whether the taking rendered damages to the remainder, *see* Yellow Book at 37 ("The result . . . includes . . . any compensable damages . . . to the remainder property."), warranting additional compensation, *see Technical College*, 145 Fed. Cl. at 426 (quoting *Raulerson v. United States*, 99 Fed. Cl. 9, 12 (2011)); *Hendler*, 175 F.3d at 1383 ("[J]ust compensation under the takings clause of the Constitution includes . . . the damage to the remainder resulting from the taking.").

Plaintiff does not argue there was damage to the remainder in the form of physical or structural harm to the land or improvements in the remainder; rather, plaintiff argues the damages to the remainder here involve primarily "a complete loss of yard privacy and some loss of privacy through windows into the residences." PX21 at 56–57 (Cook Expert Report). Plaintiff's argument relies on Mr. Cook to determine the value of such harm, and he did so by looking at both "paired sales analys[es] and anecdotal" evidence. *Id.* at 36. Mr. Cook's paired sales analyses revealed "a significant range in value loss" from trail adjacency "between 5.2 and 41.1 percent." *Id.* at 51. All properties in the sales analyses, however, involved single family homes, single family lots, or undeveloped residential acreage. *Id.*

The first paired sales analysis Mr. Cook considered stems from Judge Sweeney's decision in *Hardy v. United States*, 141 Fed. Cl. 1 (2018). There, in considering "the reliability of the conclusion . . . that the small residential parcels in Covington[, Georgia] experienced a decrease . . . of their land value due to their adjacency to [a] trail," Judge Sweeney credited a study indicating the parcels "los[t] 20.5% of their land value" because they were "adjacent to the trail." *Id.* at 28–29. Although the single-family homes in suburban Atlanta in *Hardy* are not directly analogous to the multifamily properties in the city of Atlanta at issue in this case, Judge Sweeney's conclusion "provides context" for the Court to consider in determining whether and to what extent trail adjacency devalued the Subject Property in the after condition. *See id.* at 29; *cf. Jackson v. United States*, 155 Fed. Cl. 689, 712 (2021) (explaining with respect to "59 properties adjacent to a former railroad corridor in Newton County, Georgia" the "majority of [the expert's] . . . assessments of damage to the remainder range from 2–45% of the subject property's . . . value," specifically "6–14% for residential properties").

Mr. Cook's second paired sales analysis involved single-family homes in "Ballston Spa, New York," a town "approximately 20 miles northwest of Albany in Saratoga County." PX21 at 44 (Cook Expert Report). Mr. Cook compared homes in a "16-lot subdivision known as Kaleen Manor," with "railroad tracks on the east and west sides," to "comparable sales . . . not located along a rail line." *Id.* Despite noting being "situated narrowly between two rail lines[] is inferior" to the Subject Property's trail adjacency, after reviewing the data from his analysis, Mr. Cook found the "diminution factor of 16.67 percent" from this study reasonably applicable to the instant case. *Id.* at 40. The Court, however, agrees with Mr. Cook's assessment of trail adjacency being superior to properties "situated narrowly between two rail lines," and therefore finds this second study inapposite to the instant case. *See Sarif Biomedical*, 725 Fed. Appx. at 1000 (explaining the "Court is entitled to weigh the credibility of an expert's testimony" (citing *Celsis In Vitro*, 664 F.3d at 929)).

Mr. Cook then analyzed "paired lot sales [] for a [] subdivision in Lehi, Utah located along a rails-to-trails project and semi-abandoned railroad corridor with the rail lines still in place." PX21 at 40. His analysis "with adjustments for market conditions suggest[ed] a discount for lots adjacent to the trail in the range of 1.0 to 8.4%, averaging 5.2%." *Id.* at 41. This study— like the study credited by Judge Sweeney in *Hardy*—is methodologically sound but involves single-family lots which "provides [the Court] context" but is not perfectly applicable to the Subject Property. *Compare id., with Hardy*, 141 Fed. Cl. at 29.

Mr. Cook's next paired sales analysis in Cranberry Farms, like his Ballston Spa example, involved a "subdivision [] located adjacent to an active rail line." PX21 at 42. The "diminution to [] lot value . . . [of] roughly 33%" uncovered by Mr. Cook by virtue of being within "66 feet" of the rail line is thus unhelpful to the Court's analysis of the effect of *trail adjacency* on the Subject Property's market value. *See id.* at 46; *see Sarif Biomedical*, 725 Fed. Appx. at 1000 (citation omitted).

Finally, Mr. Cook conducted a paired sales analysis of large, undeveloped residential acreage, *see* PX21 at 51, in Gilbert, Arizona, both "along an active railroad corridor" and "off the corridor," *id.* at 46. As with the Ballston Spa and Cranberry Farms analyses, this analysis of undeveloped land along an "active railroad corridor," *id.*, provides little insight into the

diminution in value caused by the BeltLine trail to the Subject Property, *see supra*; *Sarif Biomedical*, 725 Fed. Appx. at 1000 (citation omitted).

As studies two, four, and five are inapposite to this case, the Court considers only: (1) the 20.5% diminution factor adopted in *Hardy*; (2) the analysis performed by Judge Williams in *Jackson*; and (3) the 5.2% diminution factor set forth by Mr. Cook in his paired sales analysis of homes in Lehi, Utah, in determining whether and to what extent the BeltLine harmed the value of the remainder in this case, *see supra*. The Court need not rely on the anecdotal evidence set forth by Mr. Cook, *see* PX21 at 51–57 (Cook Expert Report), as this evidence—consisting of surveys regarding attitudes towards trails, appraisals of multi-acre agricultural properties, and a case not employing a diminution factor when considering harm to the remainder—is not helpful in calculating a percentage to apply to account for harm to the remainder for the Subject Property, *see id*. As all credible evidence indicates trail adjacency negatively affects the market value of residential properties, the Court will apply a diminution factor to the $40.37 price per square foot calculated for the Subject Property in the before condition. *See supra*; *Hendler*, 175 F.3d at 1383 ("[J]ust compensation under the takings clause of the Constitution includes . . . the damage to the remainder resulting from the taking.").

Although Mr. Cook did not present a perfectly comparable paired sales analysis involving multifamily residential properties along an urban trail, based upon *Hardy*, *Jackson*, and the Lehi, Utah analysis, the Court finds a diminution factor of 20%—as suggested by Mr. Cook—warranted. *See* PX21 at 58 ("A diminution factor of 20 percent is reasonably supported from the range of diminution indicated [by paired sales analyses and anecdotal evidence]."). The court's analysis in *Hardy*, involving residential properties in suburban Atlanta located along a converted trail, is most comparable to the instant case. *See Hardy*, 141 Fed. Cl. 1. Further, in reviewing the evidence in the record, *see* PX7 at PLF0001234–42 (Images of the Subject Property), the Court agrees with Mr. Cook—the BeltLine and accompanying concrete ramp have "complete[ly] [destroyed plaintiff's] yard privacy and" have led to at least "some loss of privacy through windows into the residences," PX21 at 57–58; *see generally Jackson*, 155 Fed. Cl. 689 (considering the impact of the loss of privacy on land along a trail easement). The following image depicts the BeltLine ramp overlooking the Subject Property's side and backyard windows, parking area, and backyard porches.[9]

---

[9] The Court redacted this image to remove third-party individuals captured in the photograph.



*See* PX7 at PLF0001234.

As the government did not present any evidence indicating a lesser diminution factor should apply, *see* Tr. at 1220:13–23 (Government), and the Court finds plaintiff's evidence of a 20% diminution factor credible, the Court accordingly applies this factor to the $40.37 per square foot before-condition price determined *supra*. Applying the 20% diminution factor to the before-condition price per square foot yields an after-condition price per square foot of $32.30 ($40.37 × 0.8). The after-condition value of the remaining land in the Subject Property—9,770 square feet—is therefore $315,571 ($32.30 × 9,770 square feet).

### E.    Plaintiff's Just Compensation

Pursuant to Sections VIII.B–C, *supra*, plaintiff is entitled to a damages award of $684,429, exclusive of interest, calculated as follows:

| Condition | Parcel Size (sq. ft.) | Price Per Square Foot ($) | Value ($ Rounded) |
|-----------|----------------------|---------------------------|-------------------|
| **Before** | 24,770 | 40.37 | 1,000,000 |
| **After** | 9770 | 32.30 | 315,571 |
| | | **Damages = $684,429** | |

**IX.    Conclusion**

Accordingly, as discussed *supra* Sections II–IV, the Court:

(1) **GRANTS** plaintiff's Motion to Sustain Hearsay Objection to Statements Contained within the United States' Exhibit 200, ECF No. 124;

(2) **DENIES** the government's Motion in Limine to Exclude Mr. Cook, ECF No. 69;

(3) **DENIES** plaintiff's Motion in Limine to Strike Dr. Banzhaf, ECF No. 112;

(4) **DENIES** plaintiff's Motion in Limine to Exclude the Testimony of Mr. Clementi and All Evidence of Plaintiff's 2021 Sale of the Subject Property, ECF No. 66;

(5) finds as **MOOT** plaintiff's Motion in Limine to Exclude Certain Witnesses, including Mr. Pace, ECF No. 76;

(6) **DENIES** plaintiff's Motion in Limine to Exclude the Testimony of Mr. Eslava, ECF No. 65;

(7) finds as **MOOT** the government's Motion to Strike plaintiff's Reply in support of the Motion in Limine to Strike Eslava as an expert, ECF No. 100;

(8) **DENIES** the government's Motion in Limine to Exclude Certain Testimony of Mr. Tatos, ECF No. 67; and

(9) **DENIES** the government's Motion in Limine to Strike Certain Testimony by Mr. Matthews, ECF No. 68.

The Court awards compensation to plaintiff in the amount of **$684,429.00**, exclusive of interest.  As pursuant to the Supreme Court, "if disbursement of the award [in a Fifth Amendment takings case] is delayed, the owner is entitled to interest [] on [the award of damages] sufficient to ensure that [s]he is placed in as good a position pecuniarily as [s]he would have occupied if the payment had coincided with the appropriation."  *Kirby Forest Indust., Inc. v. United States*, 467 U.S. 1, 10 (1984).  Thus, the parties **SHALL FILE** a joint status report ("JSR") on or before **11 March 2025** jointly proposing an appropriate interest rate and amount, dating back to the 28 September 2017 date of taking, for the Court to use in entering judgment. The parties' JSR **SHALL** include a proposal regarding next steps in this case, including whether plaintiff will request attorneys' fees and whether the government intends to oppose this request. The parties should heed the guidance of the Court's recent decision in *Hippely v. United States*, in determining the necessity of extensive briefing regarding attorneys' fees.  *See* 173 Fed. Cl. 389 (2024).

**IT IS SO ORDERED**

s/ Ryan T. Holte
RYAN T. HOLTE
Judge